## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| HIGH RIDGE BRANDS CO., *et al.*,[1] | Case No. 19–_____ (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF M. BENJAMIN JONES IN SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS AND APPLICATIONS

I, M. Benjamin Jones, declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that:

1.      I am the Chief Restructuring Officer (the "**CRO**") of the above-captioned debtors and debtors-in-possession (collectively, the "**Debtors**" or "**High Ridge**").  I am also a Senior Managing Director of Ankura Consulting Group, LLC ("**Ankura**").  I am familiar with the day-to-day operations and business and financial affairs of the Debtors, having worked with the Debtors since July 9, 2019.  All facts set forth in this declaration (this "**Declaration**") are based on my personal knowledge, my communications with other members of the Debtors' senior management, discussions with my colleagues who are also working on this matter, my review of relevant documents, or my opinion, based on my overall professional experience, in light of my personal knowledge of the Debtors' operations, business affairs, and financial condition.  If called as a witness, I could and would competently testify to the matters set forth herein based on the foregoing.  I am duly authorized to submit this Declaration on behalf of the Debtors.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: High Ridge Brands Holdings, Inc. (5996); HRB Midco, Inc. (8170); HRB Buyer, Inc. (3945); High Ridge Brands Co. (5871); Golden Sun, Inc. (4712); Continental Fragrances, Ltd. (2541); Freshcorp, Inc. (3238); Children Oral Care, LLC (disregarded entity for tax purposes); and Dr. Fresh, LLC (5167).  The mailing address for each of the Debtors is 333 Ludlow Street, South Tower, 2nd Floor, Stamford, Connecticut 06902.

2.	I have more than twenty years of experience in the complex corporate reorganization industry, and I have served in numerous turnaround management positions including president, CRO, and chief financial officer for both private and public companies. I have played key roles in dozens of high-profile restructurings/mergers and acquisitions including Trident Holdings, Mariner Post-Acute Networks, Centennial Healthcare, World Health Alternatives, The Penn Traffic Company, Milacron, Lionel, Caraustar Industries, Golden Books Family Entertainment, and Signature Healthcare. Prior to joining Ankura, I began my career at Ernst & Young, focusing on valuations and middle-market corporate finance transactions. In 1998, I joined CDG Group to focus on restructurings and reorganizations, rising to the level of senior managing director. I have a bachelor's degree in accounting, with distinction, from Wake Forest University.

3.	On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"). The Debtors intend to continue in possession of their assets and the management of their businesses as debtors-in-possession during the pendency of these chapter 11 cases (the "**Chapter 11 Cases**").

4.	This Declaration is submitted (i) to provide a brief overview of the Debtors and the Chapter 11 Cases and (ii) in support of the Debtors' chapter 11 petitions and "first day" motions and applications (collectively, the "**First Day Motions**"), which have been filed, among other things, to minimize the adverse effects of the Debtors' filing for chapter 11 protection and to enhance the Debtors' ability to maximize value for the benefit of their estates and creditors.

5.	A chart detailing the organizational structure of the Debtors as of the Petition Date is attached hereto as Exhibit A (the "**Organizational Chart**").

24977308.17

## GENERAL BACKGROUND

**A.      The Debtors' History**

6.      High Ridge was formed to acquire the rights to the Zest soap brand in the United States, Canada, Puerto Rico, and certain other Caribbean countries from The Procter & Gamble Company in January 2011.  From 2011 to 2015, the Debtors focused their portfolio on skin cleansing and hair care products, developing a broad mix of value brands and channels of distribution.  Given their focus on value price points, the goal of the Debtors' early strategy was to minimize costs, which they did by concentrating supply and optimizing logistics to leverage unit volumes to create a low cost structure with fully outsourced manufacturing and logistics primarily in the United States.  Said differently, the Debtors' original business plan revolved around low-cost, low-margin, and high-volume product distribution.  Since acquiring the Zest rights in 2011, the Debtors have built a multi-brand personal care platform by successfully integrating six additional acquisitions, the most recent of which being the DR. Fresh business.

7.      On December 29, 2016, the Debtors acquired DR. Fresh, which focuses on select oral care subcategories such as value manual toothbrushes, children's oral health, and travel kits.  DR. Fresh's products include manual and power toothbrushes, oral rinses, travel kits, floss, and picks.  DR. Fresh's value-focused brands include REACH and DR. Fresh.  Its children-focused brand, Firefly, maintains a strong portfolio of licensed products, such as LOL, Avengers, and Lion King, among others.  Similar to the Debtors' skin cleansing and hair care business, DR. Fresh operated on an Asset Light Model (as defined below) with multiple suppliers of most product lines, primarily located in China.  DR. Fresh's products, like the Debtors' skin cleansing and hair care platforms, are generally consumable and non-discretionary in nature, positioning

24977308.17

them for resilience through economic cycles and aligning them in this regard with the overall portfolio of the Debtors' products.

8.      Given that the Company's hair care and skin cleansing brand portfolio was concentrated in product segments (*e.g.*, bar soap and hair spray) and price points (*e.g.*, opening price points and value) that were shrinking due to shifting consumer preferences and a strong economy that led to a reduction in shelf space allotted to value priced products, the Debtors have focused recently on transformative innovation to drive topline growth in growing segments (*e.g.*, natural products, texturizers, and body wash) at slightly higher price points.  The company has also invested in capability and capacity across the organization to elevate the speed it can bring products to market, its customer service, and its performance management.  These tactics, in conjunction with their recent acquisitions, have positioned the Debtors well for sustainable, profitable growth.

9.      The United States represents the vast majority of the Debtors' net sales; however, the Debtors also sell their products in certain international markets, including Canada, the United Kingdom, and Mexico.  In addition, the Debtors' acquisition of DR. Fresh in 2016, which provided High Ridge with an office in the United Kingdom, effectively positions the Debtors to expand their international presence for their combined businesses.

10.     During the twelve-month period ended December 31, 2018, the Debtors generated net sales of $301.1 million, net loss of $62.5 million, and Adjusted EBITDA of $35.5 million.

**B.      The Debtors' Product Categories**

11.     High Ridge is one of the ten largest independent branded personal care companies in the United States by unit volume.  The Debtors, headquartered in Stamford,

24977308.17

Connecticut, have developed a diverse portfolio of over fourteen trusted brands across a wide variety of market segments with a particular focus on skin cleansing, hair care, and oral care, many of which are household names that enjoy strong brand recognition with consumers.  In the United States, the Debtors operate in the $8.3 billion skin cleansing, $13.1 billion hair care, and $8.6 billion oral care categories (the "**Product Categories**").  The Debtors sell their products, and have a track record of effectively launching new products, across multiple retail channels including mass market, dollar, grocery, and drug stores.

### i.      *Skin Cleansing*

12.     In the Debtors' skin cleansing Product Category, which comprised approximately 32% of the Debtors' net sales for the twelve-month period ended December 31, 2018, the Debtors focus on the value subcategory.  The Debtors' products in this category include bar soap and body wash and the skin cleansing brand portfolio includes Zest, Coast, and White Rain.  The Debtors are ranked fifth in skin cleansing in the United States,[2] and the corporate strategy for the skin cleansing Product Category is to offer quality products with compelling benefits at value price points.  The focus for the skin cleansing Product Category is on increasing profitably; growing the brands through marketing support, a pipeline of new products, and innovation; and maximizing distribution gains.

### ii.     *Hair Care*

13.     In the Debtors' hair care Product Category, which comprised approximately 33% of the Debtors' net sales for the twelve-month period ended December 31, 2018, the Debtors focus on the value and premium subcategories.  The Debtors' products in this category include shampoo and conditioner, hair spray, gel, mousse, and other hair treatment

---

[2]  Based on Nielsen tracked channel sales for 52 week period ended 6/15/19 for skin cleansing, by unit volume.

products and the hair care portfolio of value brands includes Alberto VO5, White Rain, Rave, and LA Looks while the portfolio of premium brands includes SGX NYC, Thicker Fuller Hair, and Zero Frizz brands.  The Debtors are ranked sixth in the hair care Product Category in the United States.[3]  The focus for the hair care Product Category is to maximize growth by delivering compelling innovation that delivers premium product performance at mass-market prices, driving sales through marketing, and increasing distribution.

### iii.    Oral Care

14.    In the Debtors' oral care Product Category, which comprised approximately 35% of the Debtors' net sales for the twelve-month period ended December 31, 2018, the Debtors focus on the value and children's subcategories.  The Debtors' products in this category include manual and power toothbrushes, oral rinses, travel kits, floss, and picks.  The Debtors' oral care value brands include REACH and DR. Fresh while the Debtors' children-focused brand, Firefly, provides products that are fun and entertaining for children while teaching healthy oral care habits.  The Debtors are currently ranked first in kids' toothbrushes and second in adult manual toothbrushes in the United States.[4]  The focus for the value subcategory is to provide premium-equivalent features at a compelling value price point, while the focus for the children's subcategory is to offer innovative designs and leverage Firefly's proven licensing strategy with top children's franchises, which include Avengers, Lion King, LOL Surprise, Shopkins, Treasure X, Spongebob, Paw Patrol, My Little Pony, Barbie, and Hello Kitty, among others.  In addition, DR. Fresh has a strong track record of product innovation in this category with 81 new product launches since 2014.

---

[3]  Based on Nielsen tracked channel sales for 52 week period ended 6/15/19 for hair care, by unit volume.

[4]  Nielsen tracked channel sales for 52 week period ended 6/15/19 for oral care.  Kids figure includes toothbrush and rinse categories and based on units.  Adult manual toothbrush figure based on equivalized units.

24977308.17

C.      **The Asset Light Model**

15.     The Debtors operate on an asset-light, low-cost business model (the "**Asset Light Model**"), which allows for a flexible and scalable cost structure, provides the Debtors with volume-driven cost advantages, and enables a low level of capital investment in machinery, equipment, and working capital.  The Debtors are one of only a few large-scale, branded, personal care companies in the United States that exclusively follows the Asset Light Model, and the Debtors' high-unit volumes make High Ridge an important customer to third-party vendors. Further, the Asset Light Model allows the Debtors to focus their resources on sales and marketing, product innovation and commercialization, production planning and efficient inventory management, quality and cost control across their platform.

*i.      Outsourcing and Manufacturing*

16.     In order to make the Debtors more competitive and efficiently allocate the Debtors' resources, the Debtors' strategy has been to outsource the production of their products through a highly scalable, capital-light network of third-party manufacturers.  The Debtors' contract manufacturing partners have robust research and development capabilities that the Debtors are able to leverage for low-cost, new-product development and cost-reduction initiatives.  Further, redundant capabilities across the Debtors' network of manufacturers create greater supply certainty as well as competitive pricing.  This contract manufacturing drives cost efficiency through the ongoing qualification and bidding of products, which drives down procurement costs.

17.     The Debtors enter into manufacturing agreements for many of their products, each of which varies based on the capabilities of the third-party manufacturer and the products being supplied.   These agreements outline manufacturer obligations and product

24977308.17

specifications with respect to the brand or brands being produced.  The purchase price of products is subject to change pursuant to the terms of these agreements due to fluctuations in pricing of raw materials, packaging, and labor costs.  Certain of the Debtors' other products are manufactured on a purchase order basis, which is generally based on batch sizes and results in no long-term obligations or commitments for either party.

### ii.    *Warehousing and Distribution*

18.    The Debtors receive orders from retailers and brokers primarily by electronic data interchange, which automatically enters each order into the applicable computer systems and then routes the order to the Debtors' distribution centers.  The distribution center in turn sends a confirmation that the order was received, fills and ships the order to the customer, and sends a shipment confirmation to the Debtors.  Upon receipt of the shipment confirmation, the Debtors send an invoice to the customer.

19.    The Debtors manage product distribution in the continental United States primarily through three distribution facilities located in Columbus, Ohio, St. Louis, Missouri, and Redlands, California, which are owned and operated by a third-party provider.  The Debtors' U.S. warehouse provider provides warehouse services while the Debtors' U.S. freight vendor provides handling and shipping services with respect to the Debtors' full line of products.  Between the two providers, the Debtors obtain complete management services, claims administration, proof of delivery, procurement, report generation, automation, and freight payment services.

20.    This logistics network and its supporting systems are highly scalable and have capacity to support additional growth.  The Debtors have also selected their third-party distribution centers to be strategically located to drive efficiencies in freight rates and their

24977308.17

outsourced freight management firm to leverage their scale to lower freight rates and ensure consistent on-time deliveries to customers, a critical industry key performance indicator.

**D.    The Debtors' Core Strengths**

   ### i.    *Leading Market Positions in Large and Stable Product Categories.*

21.    The Debtors competitively differentiate their products with a mission to provide excellent experiences to savvy consumers.  In the United States, the total market size of the Debtors' addressable Product Categories is approximately $30 billion.  Driven by the consumable and non-discretionary nature of many personal cleansing categories, each of the addressable subcategories in which the Debtors compete has experienced overall sales growth of approximately 1-3% over the period from 2012 to 2018.  Each of their brands has a distinct competitive position within its subcategory that the Debtors believe is important to their retailer customers.  Further, due to the Debtors' focus on key niches where they can succeed, best in class logistics platform, and speed to market with new products, the Debtors are positioned to maintain growth amidst their small independent and large multi-national competitors.  This approach has fostered strong relationships with a wide variety of retailers across the United States and Canada, and, with the acquisition of DR. Fresh, the Debtors are positioned to further expand their international presence.

   ### ii.    *Diversified Portfolio of Recognized Consumer Brands.*

22.    Several of the brands in the Debtors' portfolio were established decades ago by large multinational companies who invested significantly in national media to build strong brand recognition, and these brands continue to enjoy significant consumer awareness and loyalty.  The Debtors' research shows that these brands have broad appeal across attractive consumer demographics and are well-positioned for growth through innovation and marketing

24977308.17

support.  In addition, the Debtors' diverse product and brand portfolio reduces reliance on a single category of products, and several of our brands are favored by retailers as a result of their ability to drive increased traffic, number of items purchased, incremental sales, and above category-average retailer margins.

### iii.    *Deep and Strategic Customer Relationships*

23.    The Debtors have deep and strategic relationships with their diverse retail partners, which are driven by their scale, consumer brand affinity, flow of innovation, high service standards, and speed to market capabilities.  Given the decades-long history of many of the Debtors' brands, the Debtors' brands have been sold at several of the Debtors' retail customers since prior to the founding of High Ridge.  The Debtors add value to their retail customers by providing advisory insights to assess product categories and consumer needs, collaborating on product development, and jointly exploring white space opportunities.  The Debtors also provide customer-oriented services, including delivery, channel, and customer-specific products and packaging formats, customer pickup programs, and replenishment support. The Debtors' products are sold by nineteen of the top twenty U.S. retailers operating in the Debtors' product category markets (by revenue), with most of these retailers carrying multiple High Ridge products across each of the Debtors' Product Categories.  The Debtors' key customers include Walmart, Dollar Tree, Dollar General, Walgreens, Kroger, Family Dollar, 99 Cents Only Stores, CVS, HEB, Wakefern and other blue chip retailers.  In addition, the Debtors' experienced management team maintains direct relationships with senior management of many of the Debtors' key customers, further enhancing the strength of their customer relationships.

24977308.17

### iv.    *Differentiated Marketing and Innovation Capabilities.*

24.    The Debtors deploy efficient investments across a multifaceted marketing platform to drive brand awareness, covering traditional media as well as earned media and owned media, including social media platforms.   The Debtors' in-house product development team provides the Debtors with research and development expertise that positions High Ridge to develop products with distinctive features and strong retailer and consumer appeal.  Moreover, the Debtors new-product process enables the Debtors to quickly bring meaningful innovations to market.  For example, the Debtors efficiently leveraged their technological expertise to develop an exclusive "Bond Building" hair care technology and bring a premium hair care brand based on that technology, SGX NYC, from concept to market in twelve months.  Then, in year two, the Debtors were able to expand the product assortment to include styling and styling treatments that appeal to a broader consumer base.  Thus far, SGX NYC has won two awards, the Allure *2019 Best of Beauty Awards*, which is recognized by 82% of women nationally as the most trusted beauty award, while also succeeding in the market, having won shelf space in approximately 1,700 Target stores, which carry eight SGX NYC products, and 1,500 Walmarts, which carry nine of the brand's products.  Similar processes helped bring to market the Firefly LightSaber Brush, which went from prototype to production in approximately six months, and the Firefly Ready-Go Brush, which was one of the top selling children's manual toothbrushes in the United States in 2016.

### v.    *Management Team with Proven Ability to Acquire, Integrate, and Manage Brands.*

25.    The Debtors' management team has extensive industry experience and a proven track record of acquiring, integrating, revitalizing, and managing a wide variety of brands in several personal care categories.   Moreover, the Debtors' senior management team has

24977308.17

expertise in building and scaling a highly efficient supply chain to support growth while maintaining a disciplined approach to cost and quality management.

E.    **Capital Structure**

i.    *First Lien Credit Facility*[5]

26.    High Ridge Brands Co.; Golden Sun, Inc.; Continental Fragrances, Ltd.; Freshcorp, Inc.; Children Oral Care, LLC; and Dr. Fresh, LLC, (the "**DIP Borrowers**"), and HRB Buyer, Inc. (the "**DIP Guarantor**" and together with the DIP Borrowers, the "**DIP Debtors**") are parties to that certain *First Lien Credit Agreement*, dated as of June 30, 2016 (as amended from time to time prior to the Petition Date, the "**Prepetition First Lien Credit Agreement**" and, together with the other loan documents, the "**Prepetition First Lien Loan Documents**") with BMO Harris Bank, N.A., in its capacities as administrative agent (in such capacities, the "**Prepetition Agent**") and the lenders and issuers party thereto (the "**Prepetition First Lien Lenders**").  The Prepetition First Lien Loan Documents provide for a term loan in the maximum amount of $220,000,000 and a revolving credit facility in the maximum principal amount of $50,000,000.

27.    As of the Petition Date, the DIP Debtors were jointly and severally indebted and liable under the Prepetition First Lien Loan Documents in an aggregate principal amount not less than $263,400,000, consisting of term loans in the aggregate principal amount of $213,400,000 and revolving loans in the aggregate principal amount of $50,000,000, plus all interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses), and all other Obligations accrued, accruing, or chargeable in respect thereof or in addition thereto (collectively, the "**Prepetition First Lien Obligations**").

---

[5] Capitalized terms used but not otherwise defined in this subsection shall have the meanings ascribed to such terms in the First Lien Credit Agreement.

24977308.17

28.     In connection with the Prepetition First Lien Credit Agreement, the DIP Debtors entered into that certain *First Lien Pledge and Security Agreement,* dated as of June 30, 2016 (as amended from time to time prior to the Petition Date, the "**First Lien Security Agreement**"), by and between the DIP Debtors and the Prepetition Agent.  Pursuant to the First Lien Security Agreement and other Prepetition First Lien Loan Documents, each DIP Debtor granted senior liens upon and security interests in substantially all of such DIP Debtor's assets other than the Excluded Assets (as such term is defined in the First Lien Security Agreement) to the Prepetition Agent as security for the Prepetition First Lien Obligations.[6]

ii.     ***2017 Senior Unsecured Notes***

29.     In 2017, Debtor High Ridge Brands Co. ("**High Ridge Brands**") issued $250,000,000 in senior unsecured notes dated as of March 22, 2017 (the "**2017 Senior Unsecured Notes**" and, together with other loan documents, the "**2017 Senior Unsecured Notes Documents**") bearing interest at 8.875% with a maturity date of March 15, 2025.  High Ridge Brands' domestic subsidiaries, which are also Debtors, guaranteed the 2017 Senior Unsecured Notes.

30.     As of the Petition Date, High Ridge Brands was indebted and liable to the noteholders of the 2017 Senior Unsecured Notes (the "**Noteholders**") in an aggregate amount not less than $261,000,000 (inclusive of both principal and interest), plus additional interest accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses), and all other obligations accrued, accruing, or chargeable in respect thereof or in addition thereto.

---

[6] Contemporaneously with the First Lien Credit Agreement, the DIP Debtors also entered into that certain *Second Lien Credit Agreement* (the "**Second Lien Credit Agreement**").  The obligations related to the Second Lien Credit Agreement were fully paid in connection with the issuance of the 2017 Senior Unsecured Notes (defined below).

24977308.17

### iii.        Trade Debt

31.        As of the Petition Date, the Debtors' books and records list approximately $28.7 million in outstanding trade liabilities.

### iv.        Equity Ownership

32.        CD&R HRB Holdings, L.P., a non-debtor entity, owns 98.4% of the common stock equity Debtor High Ridge Brands Holdings, Inc., and the remaining 1.6% of the common stock equity is owned by certain management shareholders.

33.        Debtor High Ridge Brands Holdings, Inc. wholly owns Debtor HRB Midco, Inc., which in turn wholly owns Debtor HRB Buyer, Inc., which in turn wholly owns High Ridge Brands.  High Ridge Brands wholly owns Debtors Golden Sun, Inc., Continental Fragrances, Ltd., and Freshcorp, Inc.  Debtor Freschcorp, Inc. wholly owns Debtors Children Oral Care, LLC and Dr. Fresh, LLC.  *See* Organizational Chart at <u>Exhibit A</u>.

## F.        Events Leading to the Commencement of the Chapter 11 Cases

34.        The personal care industry is highly competitive and, like many other retail industries, undergoing momentous shifts as a result of changing demographics and consumer tastes.  The Debtors' oral business remains stable, but the portfolio of legacy brands of hair and skin, despite being ranked number five in skin cleansing and number six in hair care, are concentrated in market segments and price points that have been declining.  In addition, they are concentrated in opening price points, *i.e.*, the least costly line of a particular item, and a large portion of the Debtors' distribution of their legacy hair and skin products comes from Dollar Stores, both of which make it difficult to pass along inflationary input costs to consumers.  Because the Debtors' strategy had originally been a low-cost, volume-based structure with similarly low, and now shrinking, margins, this market shift forced the Debtors to pivot.  In 2018,

14

the Debtors accordingly chose to diversify their portfolio through innovation launches in growing segments within the hair and skin categories at significantly accretive gross margins. Given the annual product review cycle of most national retailers, the work the Debtors did to pivot to this strategy in 2018, which consisted of selling their innovative products during line reviews over the summer of 2018, would not bear fruit until 2019 when these products replace others on retailers' shelves.

35.    The Debtors' new strategy shifted the company's mission to "creating extraordinary experiences for savvy consumers" fueled by transformative, on-trend innovation that creates value for both consumers and customers. Examples of this new innovation include (i) new brands such as SGX NYC, the development and launch of which has been described above, (ii) relaunches of existing brands such as Thicker Fuller Hair and Zest for Life bodywash, (iii) expansion of existing brands into new categories such as Firefly Toothpaste, and (iv) a new, digital-focused marketing strategy. These innovations have been well received by consumers and retailers, with SGX NYC securing 90,000 points of distribution in its first year and winning two prestigious Allure awards (*2019 Best of Beauty Awards* for "Best of Beauty" and "Best Steals for Hair"). Similarly, Firefly Toothpaste has been accepted by several major retailers, although it will not hit shelves until the first quarter of 2020. These new innovations require meaningful brand support (marketing expense) to build awareness and trial at product launch. This increase in marketing expense began when the new innovation products started to hit retailer shelves in early 2019.

36.    While the Debtors were working to pivot their strategy to drive profitable growth through innovation in 2018, the risks of the previous strategy, which included exclusive contracts with key manufacturers to lock in low costs, became a negative reality. In particular,

the Debtors' exclusive bar soap manufacturer, which had not been able to produce sufficient capacity to fulfill orders for some months, increased the Debtors' price by 60% at the end of its contract term.  Since the relationship was exclusive, the Debtors did not have a readily available alternate supply and were forced to pay the higher costs while they sourced and qualified new suppliers, which took 9 months.  During those 9 months, the incumbent supplier was also unable to provide enough supply to service the Debtors' current customer orders, and the Debtors' service levels, i.e., delivery of orders on time and in full, fell sharply.  The Debtors' ability to deliver bar soap orders to its customers on time and in full fell from 96% in April 2018, to 69% by December 2018, to 54% by March 2019.  Although bar soap service levels have rebounded over the last few months, this inability to supply, at its worst, approximately half of the Debtors' bar soap orders had a significant negative impact on the Debtors' liquidity.  Further, this liquidity constraint came at a time when the Debtors needed that liquidity to support their innovation products with marketing investments.

37.    As a result, to preserve liquidity to fund the Debtors' debt-service obligations, the Debtors were forced to pull back on some of the innovation-brand focused marketing expenses they had planned.  This led to lower than expected sales volumes of many of their new innovation products and, therefore, excess inventories of those items.  The result of this has ultimately been that the Debtors' efforts to pivot to a more diversified portfolio with an innovation focus has continued to be hindered by the Debtors' liquidity profile.

## G.    Prepetition Restructuring Efforts

### i.    Efforts to Address Short-Term Liquidity Constraints

38.    From the fourth quarter of 2018 to the first quarter of 2019, the Debtors' liquidity declined by approximately $20 million.  This decline resulted from more than

$16 million of cash interest and amortization on account of the Debtors' secured and unsecured debt and working capital outflow of close to $6 million, which resulted primarily from the Debtors carrying higher inventory balances.  As a result of—and to address—this liquidity constraint, the DIP Debtors and the Prepetition Agent and Prepetition First Lien Lenders entered into a waiver to the Prepetition First Lien Credit Agreement on April 26, 2019 (the "**Limited Waiver Agreement**") that, among other things, waived the leverage ratio financial covenant under the Prepetition First Lien Credit Agreement for the financial covenant periods ending March 31, 2019, and June 30, 2019 (the "**Financial Covenant Waiver**").

39.     Although the Financial Covenant Waiver provided the DIP Debtors with additional operational liquidity, the DIP Debtors' overall liquidity continued to be strained.  In light of this, throughout the summer of 2019, the Debtors actively engaged with the Prepetition First Lien Lenders and an ad hoc group of the Noteholders (the "**Ad Hoc Group**") to attempt to craft both a short-term and a long-term solution to the DIP Debtors' liquidity problems.

40.     As to a short-term solution, in accordance with the Limited Waiver Agreement, the Prepetition First Lien Lenders agreed to extend the Financial Covenant Waiver to July 31, 2019, and then to August 15, 2019.  On August 15, 2019, the Prepetition First Lien Lenders and the DIP Debtors extended the Financial Covenant Waiver (the "**First Limited Waiver Extension**") that, among other things, further extended the Financial Covenant Waiver to August 23, 2019.  The First Limited Waiver Extension gave the Prepetition Agent the discretion to further extend the Financial Covenant Waiver on a weekly basis to September 12, 2019, which the Prepetition Agent ultimately did.[7]  On September 9, 2019, the Prepetition First Lien Lenders and the DIP Debtors further extended the Financial Covenant Waiver to October 8, 2019, and

---

[7]  Specifically, the First Lien Agent extended the Financial Covenant Waiver to August 30, September 4, and September 10.

entered into a forbearance with respect to amortization and interest payments due in September under the Prepetition First Lien Credit Agreement (together, the "**Second Limited Waiver Extension and Forbearance**").  The Second Limited Waiver Extension and Forbearance was extended to October 15, 2019, November 15, 2019, December 13, 2019, and finally to December 18, 2019.

>       *ii.*       *Initial Consideration of Restructuring Alternatives*

41.     As to a long-term solution, the Debtors utilized the time provided by the various waivers to consider possible restructuring alternatives.  Specifically, the Debtors explored (1) a consensual restructuring among the Debtors, the Prepetition First Lien Lenders, and the Noteholders; (2) a plan of reorganization sponsored by the Prepetition First Lien Lenders; (3) a toggle plan with a focus on a sale of the Debtors' assets with a reorganization backstop; (4) a chapter 11 sale process with the Prepetition First Lien Lenders acting as a stalking horse bidder; and (5) a chapter 11 sale process funded by a debtor-in-possession facility provided by the Prepetition First Lien Lenders or some subset thereof.

42.     The Debtors' initial goal was to effectuate a consensual restructuring out of court, and the Debtors engaged with both the Prepetition First Lien Lenders and the Ad Hoc Group to explore this possibility prior to commencing the Sale Process (defined below) in September of this year.  As part of this, the Debtors provided the Ad Hoc Group with a significant amount of due diligence and held a number of meetings with the Ad Hoc Group's professionals. Although the initial discussions did result in the Ad Hoc Group providing the Debtors with an initial set of potential terms for a restructuring, negotiations ultimately dwindled such that the Debtors decided they needed to pivot to other restructuring alternatives.

24977308.17

### iii.    *Negotiation of Debtor-in-Possession Financing*

43.    After a great deal of discussion and negotiation with the Prepetition First Lien Lenders regarding restructuring alternatives, the Prepetition First Lien Lenders agreed to provide the DIP Debtors with a senior secured, superpriority debtor-in-possession credit facility (the "**DIP Facility**") to fund a chapter 11 process for the sale of the DIP Debtors' assets (the "**Sale Process**").  On August 30, 2019, the DIP Debtors entered into a commitment letter (the "**First Commitment Letter**") pursuant to which the Prepetition Agent and certain of the Prepetition First Lien Lenders (the "**DIP Lenders**") agreed to provide a $70.0 million DIP Facility, including a $35 million senior secured, superpriority term loan facility for cash advances to the DIP Debtors.  The First Commitment Letter had a termination date of September 5, 2019, and contemplated that the DIP Debtors would commence the Chapter 11 Cases prior to September 5, 2019.

44.    In connection with the First Commitment Letter, and in an effort to maximize the value of the estates, the Debtors raised the possibility with the Prepetition Agent of commencing the Sale Process prior to commencing the Chapter 11 Cases, which the Debtors felt would enhance the value of the Debtors' estates as it would provide the Debtors with the ability to significantly advance the yearly line-review process with their customers while also providing the Debtors with the opportunity to advance the Sale Process prior to commencing the Chapter 11 Cases.  While the parties explored this possibility, they entered into a second commitment letter on September 3, 2019 (the "**Second Commitment Letter**"), which extended the termination of the DIP Facility commitment to September 10, 2019.  Ultimately, the DIP Lenders agreed with the Debtors that commencing the Sale Process prior to commencing the Chapter 11 Cases was worth pursuing, and, as part of this, agreed to extend the DIP Facility commitment to October 8.

19

45.     As the October 8 deadline approached, given the Debtors' progress, the DIP Lenders agreed to extend the DIP Facility commitment incrementally to October 16, 2019, and then, pursuant to a third commitment letter entered into on October 11, 2019 (the "**Third Commitment Letter**"), to November 19, 2019, and then to December 3, 2019.  On November 26, 2019, the DIP Debtors and the DIP Lenders entered into an amendment to the Third Commitment Letter that extended the DIP Facility Commitment to December 17, 2019, and, given the DIP Debtors' current liquidity position and forecasted liquidity needs over the course of the Chapter 11 Cases, decreased the size of the DIP Facility to $40 million with a $20 million senior secured, superpriority term loan facility for cash advances to the DIP Debtors.  On December 13, 2019, the DIP Debtors and the DIP Lenders entered into a second amendment to the Third Commitment Letter that extended the DIP Facility Commitment to December 18, 2019.

### iv.     *Negotiating the Noteholder Forbearance*

46.     Although the Second Limited Waiver Extension and Forbearance provided the DIP Debtors with the requisite liquidity to continue operating in the short term and the Second Commitment Letter guaranteed the DIP Debtors with the requisite funding for the Chapter 11 Cases, neither addressed the liquidity shortfall related to the September 16, 2019, interest payment due to the 2017 Senior Unsecured Notes (the "**September Notes Payment**").  As such, the Debtors were unable to make the September Notes Payment and instead opted to utilize the thirty-day grace period for such payment provided by the 2017 Senior Unsecured Notes Documents (the "**Grace Period**").

47.     On October 11, 2019, during the Grace Period, the Debtors entered into a forbearance agreement with the Ad Hoc Group (the "**Notes Forbearance Agreement**").  Under the Notes Forbearance Agreement, certain Noteholders agreed to forbear from exercising rights

and remedies under the 2017 Senior Unsecured Notes Documents in connection with the September Notes Payment during the period from October 16, 2019, through November 17, 2019 (the "**Notes Forbearance Period**") for a fee of 0.25% of the outstanding principal amount of 2017 Senior Secured Notes held by each forbearing Noteholder.    The Notes Forbearance Agreement further provided that the Notes Forbearance Period could be extended at the option of High Ridge Brands through November 30, 2019, for an additional fee of 0.10% of the outstanding principal amount of 2017 Senior Secured Notes held by each forbearing Noteholder (the "**Additional Fee**").    On November 17, 2019, High Ridge Brands chose to extend the Notes Forbearance Period through November 30, 2019, and paid the Additional Fee.    Pursuant to a supplemental forbearance agreement entered into on November 20, 2019, and an amendment thereto entered into on December 13, 2019 (collectively with the Notes Forbearance Agreement, the "**Notes Forbearance Agreements**"), the Debtors further extended the Notes Forbearance Period to December 15, 2019, and finally to December 18, 2019 (the "**Notes Forbearance Termination Date**").

###### v.    *Prepetition Marketing Efforts and Further Noteholder Negotiations*

48.    The Debtors commenced the Sale Process on September 3, 2019.    PJT Partners LP ("**PJT**"), the Debtors' proposed investment banker, contacted approximately 125 potential investors on behalf of the Debtors, with the aim of attracting multiple proposals to acquire the Debtors' business on a cash-free, debt-free basis.    In connection with this solicitation, the Debtors and their advisors prepared, among other things, a confidential information memorandum ("**CIM**") to provide potential investors and bidders with adequate information upon which to make a proposal.    During this process, forty-four (44) parties executed confidentiality

agreements and were granted access to the CIM, which contains significant diligence and other confidential information about the Debtors' business.

49.     By October 10, ten (10) indications of interest had been received by the Debtors.  Certain of the bids were for the entire Debtors' business, whereas others were for a segment or segments of the Debtors' business.  Subsequent to receiving these indications of interest, the Debtors provided access to an electronic data room to nine (9) of the parties who had submitted indications of interest.   Additionally, the Debtors' management team hosted management meetings with these parties to facilitate further diligence of the business.  Ultimately, two (2) parties revised their initial indications of interest and several other parties noted that, although they would not be able to meet the timeline the Debtors had proposed, they remained interested in the process.

50.     While the Debtors were marketing their assets, they continued to explore a consensual restructuring with the Prepetition First Lien Lenders and the Ad Hoc Group. Although the Prepetition First Lien Lenders and the Ad Hoc Group each proposed potential structures a consensual restructuring could take, ultimately the parties were not able to reach an agreement prior to the commencement of the Chapter 11 Cases.

     *vi.*     ***Decision to Commence the Chapter 11 Cases***

51.     Under the Notes Forbearance Agreements, if High Ridge Brands continued to be in default under the 2017 Senior Unsecured Notes Documents after the Notes Forbearance Period, the Noteholders would have the ability to demand repayment of the outstanding debt at such time.  As the ultimate Notes Forbearance Termination Date approached, it became clear that High Ridge Brands would not be able to make the requisite payments to the Noteholders and would still be in default under the 2017 Senior Unsecured Notes Documents after the Notes

Forbearance Period.    As such, after evaluating all available alternatives, the Debtors, in consultation with their legal and financial advisors, made the decision to commence the Chapter 11 Cases to continue pursuing an orderly sale of the Debtors' assets in order to preserve and maximize the value of their assets for the benefit of all stakeholders.

**H.    Objectives in the Chapter 11 Cases**

52.    The Debtors intend to utilize the bankruptcy process to continue the robust Sale Process they commenced prepetition.    To effectuate this, the Debtors negotiated the following sale-related milestones as part of the debtor-in-possession financing:[8]

a.    No later than ten (10) calendar days after the Petition Date, the DIP Debtors shall file a motion (the "**Bid Procedures Motion**") with the Bankruptcy Court to approve bid procedures and establish the date of an auction (the "**Auction**") to determine a winning bidder or bidders for the Purchased Assets;

b.    No later than thirty-two (32) calendar days after the Petition Date, the Bankruptcy Court shall enter an order approving the Bid Procedures Motion, the Court shall have approved the Bid Procedures Motion;

c.    The deadline for final bids (in order to be a qualified bid) shall be on or before February 5, 2020;

d.    If qualified bids are received, the Debtors shall conduct the Auction on or before February 7, 2020;

e.    No later than three (3) calendar days (or twenty-five (25) calendar days, to the extent such proposed sale is contested) after the Auction, the sale or sales of the Debtors' assets shall be approved by the Court; and

f.    No later than fourteen (14) calendar days (or thirty-five (35) calendar days, to the extent such proposed sale is contested) after the Auction, the sale or sales of the Debtors' assets shall have closed.

---

[8]  The description of the milestones set forth herein is for illustrative purposes.  Parties are referred to the DIP Motion (as defined below) for the precise terms of the debtor-in-possession finance facility.

24977308.17

53.     The Debtors believe that pursuing the Sale Process on the timeline set forth above will ensure that they can maximize the value of their assets for the benefit of all stakeholders.  Further, the Debtors' proposed debtor-in-possession financing will not only allow them to pursue the Sale Process but also to continue to operate the Debtors' business with fully sufficient liquidity, which is to the benefit of all of the Debtors' stakeholders.

54.     In sum, based on my experience, I believe that seeking a sale transaction, in accordance with the Bid Procedures Motion and with the support of the DIP Lenders, presents the best available option for the Debtors to maximize their value under the circumstances because it provides a breathing spell for the Debtors to focus on a value-maximizing sale and an attractive mechanism under which potential buyers can acquire the Debtors as a going concern or the Debtors' assets.

## FIRST DAY MOTIONS[9]

55.     In furtherance of their restructuring efforts, the Debtors will file First Day Motions substantially contemporaneously with this Declaration, and respectfully request that the Court enter the proposed orders granting relief requested in the First Day Motions.  I believe that the relief sought in each of the First Day Motions (a) is vital to the Debtors' transition to, and operation in, chapter 11 with minimal interruption or disruption to their businesses or loss of productivity or value, and (b) constitutes a critical element in maximizing value during these Chapter 11 Cases.  In particular, in light of the Debtors' Asset Light Model, any disruption to the workforce or interruption to the outsourced manufacturing and services would immediately and severely disrupt the Debtors' business.  Such a disruption would in turn have an equally negative impact on retailer confidence.  It is therefore imperative to maintain the manufacturing and

---

[9]  Capitalized terms used in this section but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Motions, as applicable.

retailing network that underlies the Debtors' business model, and the relief sought in the First Day

Motions will play a critical role in achieving that goal.

56.    The First Day Motions that are sought to be heard at the First Day hearing

in these Chapter 11 Cases are:

- ***Debtors' Motion for an Order, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases for Procedural Purposes Only***

- ***Debtors' Application for Entry of an Order Appointing Prime Clerk LLC as Claims and Noticing Agent Effective Nunc Pro Tunc to the Petition Date***

- ***Debtors' Motion for Interim and Final Orders, (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Companies Adequately Assured of Future Payment, (III) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (IV) Setting a Final Hearing Related Thereto***

- ***Debtors' Motion for Interim and Final Order, (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto***

- ***Debtors' Motion for Interim and Final Orders (I) Authorizing Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with Insurance Programs and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto***

- ***Debtors' Motion for Entry of an Order (I) Authorizing (A) Payment of Prepetition Employee Wages, Salaries, and Other Compensation; (B) Payment of Prepetition Employee Business Expenses; (C) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (D) Payment of Workers' Compensation Obligations; (E) Payments for Which Prepetition Payroll Deductions Were Made; (F) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto***

- ***Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Honor Prepetition Obligations Related to Customer Programs and Otherwise Continue Customer Programs in the Ordinary Course of***

*Business and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Critical Vendors and Service Providers, (B) Shippers and Warehousemen, (C) Certain Vendors Entitled to Administrative Expense Status Under Section 503(b)(9) of the Bankruptcy Code, and (D) Foreign Vendors; and (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto*

- *Debtors' Motion for (I) an Order, (A) Authorizing and Approving Continued Use of Cash Management System; (B) Authorizing Use of Prepetition Bank Accounts and Check Stock; (C) Authorizing Payments of Prepetition Costs and Fees Associated with Customer Credit and Debit Card Transactions; (D) Waiving the Requirements of Section 345(b) on an <u>Interim</u> Basis; and (E) Granting Administrative Expense Status to Postpetition Intercompany Claims; and (II) a Supplemental Order Waiving the Requirements of Section 345(b) on a Final Basis*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain a Senior Secured Superpriority Postpetition Financing Facility, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Authorizing the Use of Cash Collateral, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing and (VII) Granting Related Relief* (the "**DIP Motion**")

57.     I have reviewed each of the First Day Motions (including the exhibits and schedules attached thereto) listed above, and, to the best of my knowledge, I believe that the facts set forth in the First Day Motions are true and correct.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Motions.

58.     Furthermore, as a result of my personal knowledge, information supplied to me by other members of the Debtors' management and from my colleagues that perform services for the Debtors, from my review of relevant documents, and upon my opinion based upon my experience, discussions with the Debtors' advisors and knowledge of the Debtors' operations and

24977308.17

financial condition, I believe the relief sought in the First Day Motions is necessary for the Debtors to effectuate a smooth transition into chapter 11 bankruptcy and to avoid irreparable harm to their businesses and estates, and is in the best interests of the Debtors' creditors, estates, and other stakeholders.

59.    Accordingly, for the reasons stated herein and in each of the First Day Motions filed concurrently or in connection with the commencement of these Chapter 11 Cases, I believe that the relief sought in the First Day Motions should be granted by the Court in its entirety, together with such other and further relief for the Debtors as this Court deems just and proper, in the most expeditious manner possible.

## **CONCLUSION**

In furtherance of their chapter 11 efforts, for the reasons stated herein and in each of the First Day Motions, the Debtors respectfully request that the relief sought in the First Day Motions be granted.

Dated: December 18, 2019

*/s/ M. Benjamin Jones*
M. Benjamin Jones, Chief Restructuring Officer

**<u>EXHIBIT A</u>**

**Organizational Chart**

24977308.17



