## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| HIGH RIDGE BRANDS CO., *et al.*,[1] | Case No. 19–12689 (BLS) |
| | (Jointly Administered) |
| Debtors. | **Bid Procedures Hearing: Jan. 15, 2020 at 1:30 pm**<br>**Bid Procedures Obj. Deadline: Jan. 8, 2020 at 4:00 pm**<br>**Proposed Sale Hearing:  TBD**<br>**Proposed Sale Obj. Deadline:  TBD** |

### DEBTORS' MOTION FOR ENTRY OF (A) AN ORDER (I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (II) SCHEDULING AN AUCTION FOR AND HEARING TO APPROVE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (III) APPROVING NOTICE OF RESPECTIVE DATE, TIME AND PLACE FOR AUCTION AND FOR HEARING ON APPROVAL OF SALE; (IV) APPROVING PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (V) APPROVING FORM  AND MANNER OF NOTICE THEREOF; AND (VI) GRANTING RELATED RELIEF; AND (B) AN ORDER AUTHORIZING AND APPROVING (I) THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, RIGHTS, ENCUMBRANCES, AND OTHER INTERESTS; AND (II) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS <u>AND UNEXPIRED LEASES; AND (III) RELATED RELIEF</u>

High Ridge Brands Co. and its affiliated debtors and debtors in possession (collectively,

the "**Debtors**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**")

hereby file this motion (this "**Motion**") pursuant to sections 105, 363, and 365 of title 11 of the

United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2002, 6003, 6004,

6006, 9907, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: High Ridge Brands Holdings, Inc.  (5996); HRB Midco, Inc. (8170); HRB Buyer, Inc. (3945); High Ridge Brands Co. (5871); Golden Sun, Inc. (4712); Continental Fragrances, Ltd. (2541); Freshcorp, Inc. (3238); Children Oral Care, LLC (disregarded entity for tax purposes); and Dr. Fresh, LLC (5167).  The mailing address for each of the Debtors is 333 Ludlow Street, South Tower, 2nd Floor, Stamford, Connecticut 06902.

Rules"), and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules of Bankruptcy Practice and Procedures for the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), for entry of (i) an order (a) approving bidding procedures (the "**Bidding Procedures**") for the sale or multiple sales (the "**Sale**") of substantially all of the Debtors' assets and the form and manner of notices in connection with the Bidding Procedures; (b) setting the deadline to conduct an auction (the "**Auction**"); (c) scheduling a hearing to consider approval of the Sale (the "**Sale Hearing**"), including treatment of executory contracts and unexpired leases (the "**Assignment Procedures**"); and (d) granting related relief; and (ii) an order authorizing and approving (a) the sale of Assets free and clear of liens, claims, rights, encumbrances, and other interests; (b) the assumption and assignment of certain executory contracts and unexpired leases and (c) granting related relief.  In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).   Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

2.      Pursuant to Rule 9013-1(f) of the Local Rules, the Debtors consent to the entry of a final judgment or order with respect to the Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

25051259.11

3.      The statutory and legal predicates for the relief requested herein are Bankruptcy Code sections 105, 363, and 365, Bankruptcy Rules 2002, 3007, 6004, 6006, 9007, and 9014, and Local Rules 2002-1 and 6004-1.

## BACKGROUND

### A.      General

4.      On December 18, 2019 (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No official committees have been appointed in these Chapter 11 Cases and no request has been made for the appointment of a trustee or examiner.

5.      Additional information regarding the Debtors' businesses, capital structure, and the circumstances leading to the filing of the Chapter 11 Cases is set forth in the *Declaration of M. Benjamin Jones in Support of Debtors' Chapter 11 Petitions and First Day Motions and Applications* [Docket No. 2] (the "**First Day Declaration**").[2]

### B.      The Sale Process

6.      As detailed in the First Day Declaration, the Debtors are one of the largest independent branded personal care companies in the United States by unit volume.  The Debtors' assets are primarily comprised of fourteen brands across three consumer product segments, with a particular focus on skin cleansing, hair care and oral care (each individually, a "**Segment**" or collectively, the "**Assets**").  The major brands in each respective Segment include (i) Zest, Coast, and White Rain (the "**Skin Care Segment**"); (ii) Alberto VO5, White Rain, Rave, LA Looks, Salon Grafix (SGX), Thicker Fuller Hair, and Zero Frizz (the "**Hair Care Segment**"); and (iii)

---

[2] All terms not otherwise defined herein shall be given the meanings ascribed to them in the First Day Declaration.

25051259.11

REACH, DR. Fresh, and Firefly (the "**Oral Care Segment**").  For the avoidance of doubt, this is not an exhaustive list of the Debtors' brands.

7.      On September 3, 2019, with the assistance of PJT Partners LP ("**PJT**"), the Debtors' proposed investment banker, the Debtors commenced a sales process.  PJT contacted approximately 125 potential investors on behalf of the Debtors, with the aim of attracting multiple proposals to acquire the Debtors' business on a cash-free, debt-free basis.  In connection with this solicitation, the Debtors and their advisors prepared, among other things, a confidential information memorandum ("**CIM**") to provide potential investors and bidders with adequate information upon which to make a proposal.  During this process, forty-four (44) parties executed confidentiality agreements and were granted access to the CIM, which contains significant diligence and other confidential information about the Debtors' business.

8.      By October 10, 2019, ten (10) indications of interest had been received by the Debtors.  Certain of the bids were for the entire Debtors' business, whereas others were for a Segment or Segments.  Subsequent to receiving these indications of interest, the Debtors provided access to an electronic data room to nine (9) of the parties who had submitted indications of interest.  Additionally, the Debtors' management team hosted management meetings with these parties to facilitate further diligence of the business.  Ultimately, two (2) parties revised their initial indications of interest and several other parties noted that, although they would not be able to commit to a binding agreement within the timeframe desired by the Debtors, they remained interested in the process.

9.      As described in the First Day Declaration, while the sale process was ongoing, the Debtors continued to explore a consensual restructuring with their prepetition lenders.  Although the parties each proposed potential structures a consensual restructuring could take, they were

unable to reach an agreement prior to the Notes Forbearance Termination Date.  As such, after evaluating all available alternatives, the Debtors, in consultation with their legal and financial advisors, made the decision to commence the Chapter 11 Cases to continue pursuing an orderly sale of the Assets in order to preserve and maximize value for the benefit of all stakeholders.

**C.      The Sale Timeline**

10.      In light of the Debtors' significant prepetition marketing efforts that began as early as September 3, 2019, the Debtors seek to proceed with an expeditious sale of the Assets and administer these Chapter 11 Cases quickly for the benefit of their estates and all creditors.

11.      In accordance with the DIP Credit Agreement, the Debtors agreed to a sale timeline that adequately balances the Debtors' need to extend their prepetition marketing process, with the need of their secured lenders to have certainty on how and when the Debtors' core assets will be monetized.   Specifically, the DIP Credit Agreement is conditioned on the following case milestones, among others:

a.   No later than thirty-two (32) calendar days after the Petition Date, the Bankruptcy Court shall enter an order approving the Bidding Procedures in form and substance reasonably satisfactory to the DIP Agent in its reasonable discretion as confirmed by the DIP Agent in writing;

b.   The Bidding Procedures Order (as defined below) shall require that final bids (in order to be a qualified bid) be submitted no later than February 5, 2020;

c.   The Bidding Procedures Order shall require that, no later than February 7, 2020, the DIP Debtors shall conduct the Auction for the Assets (if more than one competing qualified bid is received);

d.   No later than three (3) calendar days (or twenty-five (25) calendar days, to the extent such proposed sale is contested) after the Auction, the Court shall enter an order approving the sale of the Assets to the party or parties determined to have made the highest or otherwise best bid (which shall also include a "successful back-up bidder").

e.   No later than fourteen (14) calendar days (or thirty-five (35) calendar days, to the extent such proposed sale is contested) after the Auction, the Borrowers shall have consummated the Sale to the party determined to have made the highest or otherwise best bid for the Borrowers' assets in accordance with the Sale Order (as defined below).

## RELIEF REQUESTED

12.     By this Motion, the Debtors seek entry of an order, substantially in the form

attached hereto as Exhibit A (the "**Bidding Procedures Order**"):

    a.  authorizing and approving bidding procedures in connection with the receipt and analysis of competing bids for the Assets, substantially in the form attached as Exhibit 1 to the Bidding Procedures Order (the "**Bidding Procedures**");

    b.  approving the form and manner of notice of the Auction and Sale and hearing thereon, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 to the Bidding Procedures Order (the "**Notice of Auction and Sale Hearing**");

    c.  authorizing and approving procedures for the assumption and assignment of the Assumed Contracts (defined below), as applicable, in connection with the Sale;

    d.  approving the form and manner of notice of the potential assumption and assignment of Assumed Contracts, substantially in the form attached to the Bidding Procedures Order as Exhibit 3 thereto (the "**Potential Assumption and Assignment Notice**"); and

    e.  establishing the following dates and deadlines, subject to modification as needed, relating to competitive bidding and approval of the Sale:

- Bid Deadline:  February 5, 2020 at 5:00 p.m. prevailing Eastern Time, as the deadline by which all binding bids must be actually received pursuant to the Bidding Procedures (the "**Bid Deadline**");

- Auction:  February 7, 2020, at 10:00 a.m. prevailing Eastern Time, as the time for commencement of an Auction if more than one competing Qualified Bid (as defined below) is received with respect to any of the Assets.

- Notice of Successful Bidder(s):  Within twelve (12) hours following conclusion of the Auction, as the deadline for filing any Notice of Successful Bidder; and

- Sale Hearing:  Subject to the Court's availability, no more than three (3) calendar days after the respective Auction (or on or before twenty-five (25) calendar days after the Auction, to the extent such proposed sale is contested), as the date by which the Debtors will seek approval of any proposed sale.

13.     Additionally, by this Motion, the Debtors seek entry of an order (the "**Sale Order**")

authorizing (a) the sale of the Assets free and clear of all claims, liens, liabilities, rights, interests

and encumbrances (except certain permitted encumbrances as determined by the Debtors); (b) the

Debtors to assume and assign Assumed Contracts; and (c) any and all related relief requested

herein.  The Debtors propose to file a proposed form of the Sale Order no later than fourteen (14)

days prior to the Sale Hearing, subject to modifications by the Debtors and the Successful Bidder(s)

following the Auction.

## I.    OVERVIEW OF BIDDING PROCEDURES, NOTICE PROCEDURES AND ASSIGNMENT AND ASSUMPTION PROCEDURES

### A.    Bidding Procedures

14.    The Bidding Procedures are intended to permit a fair and efficient competitive sale

process, consistent with the timeline of these Chapter 11 Cases, and to promptly identify the bid

or bids that constitute the highest or otherwise best offer for the Assets.  The Bidding Procedures

establish, among other things:[3]

a.  the requirements a Potential Bidder must satisfy to be entitled to participate in the bidding process and become a Qualified Bidder (as defined below);

b.  the requirements for submitting bids and the method and criteria by which such bids become entitled to be a Qualified Bid (as defined below);

c.  the availability of, access to, and conduct during due diligence by Potential Bidders;

d.  the deadline by which bids must be submitted;

e.  the procedures for conducting the Auction;

f.  the criteria by which a Successful Bidder(s) will be selected by the Debtors; and

g.  various other matters relating to the sale process generally, the Sale Hearing, return of any Good Faith Deposits, and designation of Next-Highest Bidders.

---

[3]  The brief description of the Bidding Procedures provided for herein is for the convenience of the Court and parties in interest.  The full copy of the Bidding Procedures should be reviewed in its entirety and will control in the event of any inconsistency or ambiguity in any descriptions of them herein.  Capitalized terms used in this summary and not otherwise defined herein will have the meanings given to them in the Bidding Procedures.

15.     Importantly, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize sale value, and, as such, do not impair the Debtors' ability to consider all qualified bid proposals and preserve the Debtors' right to modify the Bidding Procedures as necessary or appropriate to maximize value for their estates in consultation with key parties set forth therein (the "**Consultation Parties**"), consistent with the terms of the DIP Credit Agreement.

16.     The Bidding Procedures contemplate that the Debtors may solicit "stalking horse" bids, which in turn will be memorialized in one or more executed asset purchase agreements (each, a "**Stalking Horse Bid**," and any executed agreement governing the Stalking Horse Bid that memorializes the proposed transaction by and between the Stalking Horse Bidder and the Debtors for the Assets or a subset thereof, a "**Stalking Horse Agreement**") that will be binding on such bidder (a "**Stalking Horse Bidder**") and will set the floor for all Qualified Bids for applicable Assets at the Auction.

17.     The Bidding Procedures further contemplate that the Debtors may seek Court approval on shortened notice to provide customary bid protections to a Stalking Horse Bidder, including but not limited to a reasonable break-up fee and/or expense reimbursement.

18.     With respect to all Assets that are subject to an accepted Stalking Horse Bid, all Potential Bidders on the relevant Assets will be required to submit a bid in the amount of at least the sum of (i) the Stalking Horse Bid, (ii) any break-up fee and/or expense reimbursement, if and to the extent approved by prior order of the Court prior to the Bid Deadline, and (iii) a reasonable minimum overbid amount to be calculated by the Debtors, in consultation with the Consultation Parties, based on the aggregate price set forth in the Stalking Horse Bid (the "**Stalking Horse Overbid**") in order to meet the criteria of a Qualified Bid for the relevant Assets.

19.     A summary of the following provisions set forth in the Bidding Procedures Order

and the accompanying Bidding Procedures is set forth below, pursuant to Local Rule 6004-1(c):

| **Provisions Governing the Qualification of Bidders**<br><br>Bidding Procedures, Review of Bids; Designation of Qualified Bids | A "**Qualified Bidder**" is a Potential Bidder that has, among other things: (i) delivered a duly executed Purchase Agreement; (ii) provided a Bid that satisfies the Bid Requirements; (iii) provided a Good Faith Deposit; (iv) provided written evidence demonstrating that the Potential Bidder has available cash, a commitment for financing, or evidence of ability to consummate the sale; and (v) furnished Adequate Assurance Information. |
| --- | --- |
| **Provisions Governing Qualified Bids**<br><br>Bidding Procedures, Bid Requirements | A Bid submitted by a Potential Bidder that is submitted in writing and satisfies each of the Bid Requirements, as determined by the Debtors in their reasonable business judgment, in consultation with the Consultation Parties shall constitute a "**Qualified Bid.**"<br><br>a.  **Purchase Agreement**. A duly executed purchase agreement for the acquisition of the Assets or one or more Segments with a redline to reflect the changes to the Form APA (the "**Purchase Agreement**").<br><br>b.  **Disclosure of Identity and Corporate Authorization**. Each Bid must (i) fully disclose the identity of the Potential Bidder of each entity that will be bidding or otherwise participating in such Bid (including any equity owners or sponsors, if the Potential Bidder is an entity formed for the purpose of consummating the sale transaction), and the complete terms of any such participation, and (ii) include evidence of corporate authorization and approval from the Potential Bidder's board of directors (or comparable governing body) with respect to the submission, execution, and delivery of a Bid, participation in the Auction, and closing of the transactions contemplated by the Potential Bidder's Proposed Agreement in accordance with the terms of the Bid and these Bidding Procedures.<br><br>c.  **Assets / Segments(s) Purchased**. Each Bid must state with specificity the Assets or Segment(s) such Potential Bidder wishes to bid on and the respective liabilities and obligations (including applicable cure costs) to be assumed.<br><br>d.  **Purchase Price**. Each Bid must clearly identify the purchase price to be paid (the "**Purchase Price**") for the Assets. With respect to a Bid for one or more Segments, the Bid must clearly state the allocation of the Purchase price between each Segment. |

e.  **Irrevocable Offer**. Each Bid must contain a statement that such Bid is **<u>binding and irrevocable</u>** until the later of (i) the Closing Date or (ii) twenty (20) calendar days after the Sale Hearing (unless selected as the Next-Highest Bidder in which case such offer will remain open until the Closing Date).

f.  **No Contingencies.**  Each Bid must contain a statement that such Bid is not subject to any further due diligence or financing contingency.

g.  **Closing Date**. Each Bid must provide for a Closing Date that occurs no later than fourteen (14) calendar days (or thirty-five (35) calendar days, to the extent such proposed sale is contested) after the Auction.

h.  **Deposit**. Each Bid must be accompanied by a deposit in the form of a certified check or wire transfer, payable to the order of the Debtors, in an amount equal to ten percent (10%) of the aggregate cash and non-cash Purchase Price set forth in the Bid, which funds will be deposited into an interest bearing escrow account to be identified and established by the Debtors (a "**Good Faith Deposit**").

i.  **Demonstrated Financial Capacity**. Each Bid must be accompanied by written evidence, documented to the Debtors' satisfaction, demonstrating that the Potential Bidder has the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

j.  **Adequate Assurance**. Each Bid must be accompanied by Adequate Assurance Information, including information about the Potential Bidder's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements; information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capacity to consummate the proposed Sale; evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or comparable governing body) with respect to the submission of its Bid; and such additional information regarding the Potential Bidder as the Potential Bidder may elect to include.

k.  **No Fees**. Potential Bidders or Qualified Bidders, other than a Stalking Horse Bidder if so approved by the Bankruptcy Court, shall not be allowed any break-up, termination or similar fee.  Moreover, all Potential

<table>
<tr><td></td><td>Bidders, Qualified Bidders, and the Stalking Horse Bidder (excluding any Bid Protections approved by the Bankruptcy Court), by participating in the Bidding Process, will be deemed to have waived any right to seek a claim for substantial contribution pursuant to section 503 of the Bankruptcy Code, or the payment of any broker fees or costs, unless specifically agreed to by the Debtors, upon consultation with the Consultation Parties.<br><br>l. **Consent to Jurisdiction**. Each Potential Bidder must submit to the jurisdiction of the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the development and enforcement of these Bidding Procedures, the Sale documents, and the closing of the Sale, as applicable.<br><br>m. **Bid Deadline.** Each Bid must be transmitted by email (in pdf or similar format) so as to be actually received on or before 5:00 p.m. (prevailing Eastern Time) on February 5, 2020 by the Notice Parties.</td></tr>
</table>

| | |
|---|---|
| **Form APA**<br><br>Bidding Procedures, Bidding Requirements | The Debtors are in the process of preparing a form of asset purchase agreement (the "**Form APA**") for the sale of the Assets, which will be filed with the Court and provided to prospective purchasers. |
| **Modifications of Bidding Qualifications or Auction Procedures**<br><br>Bidding Procedures, Reservation of Rights | Except as otherwise set forth herein, the Debtors reserve the right to, in their reasonable business judgment, in a manner consistent with their fiduciary duties and applicable law, and in consultation with the Consultation Parties, modify these Bidding Procedures; waive terms and conditions set forth herein with respect to all Potential Bidders; extend the deadlines set forth herein; announce at the Auction modified or additional procedures for conducting the Auction; alter the assumptions set forth herein; and provide reasonable accommodations to any Stalking Horse Bidder with respect to such terms, conditions, and deadlines of the bidding and Auction process to promote further bids on the Assets, in each case, to the extent not materially inconsistent with these Bidding Procedures and the Bidding Procedures Order. |
| **Ability to Select a Stalking Horse Bidder**<br><br>Bidding Procedures, Stalking Horse Bidder(s) | Following entry of the Bidding Procedures Order, the Debtors shall be authorized, but not obligated, in consultation with the Consultation Parties, to select one or more potential bidders to act as a Stalking Horse Bidder for all or any portion of the Assets and may agree to provide such Stalking Horse Bidder(s) certain bid protections, including an expense reimbursement and/or a break-up fee (the "**Bid Protections**"); *provided* that any such Bid Protections shall be subject to approval by the Court, which the Debtors may seek on an expedited basis pursuant to section 105(a) of the Bankruptcy Code and Local Rule 9006-1(e). |

| Closing with Alternative Backup-Bidders<br><br>Bidding Procedures, Next-Highest Bidder | Notwithstanding any of the foregoing, in the event that a Successful Bidder fails to close a Sale prior to such date as specified in the applicable Purchase Agreement (or such date as may be extended by the Debtors), the Debtors, upon written notice to the Next-Highest Bidder, may designate the applicable Next-Highest Bid as the Successful Bid, the Next-Highest Bidder will be deemed to be the Successful Bidder, and the Debtors will be authorized, but not directed, to close the Sale to the Next-Highest Bidder subject to the terms of the Next-Highest Bid without the need for further order of the Bankruptcy Court and without the need for further notice to any interested parties. |
| --- | --- |

### B.    Notice Procedures for the Sale, Auction, and Sale Hearing

20.    The Debtors request approval of the Notice of Auction and Sale Hearing, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u>.  Within two (2) business days of entry of the Bidding Procedures Order, the Debtors will serve the Notice of Auction and Sale Hearing by first-class mail upon:  (a) the Office of the United States Trustee for the District of Delaware, 844 N. King Street, Room 2207, Lockbox 35, Wilmington DE, 19801, Attn: David L. Buchbinder; (b) holders of the fifty (50) largest unsecured claims on a consolidated basis against the Debtors, and counsel to the Committee, if one has been appointed; (c) counsel to the DIP Agent and Prepetition Agent, Winston & Strawn LLP, 35 West Wacker Drive, Chicago, IL 60601, Attn.: Gregory M. Gartland and Daniel J. McGuire, and Womble Bond Dickinson (US) LLP, 1313 North Market Street, Suite 1200, Wilmington, Delaware 19801, Attn.: Matthew Ward; (d) all persons known or reasonably believed to have asserted an interest in the Assets; (e) the Non-Debtor Counterparties to the Contracts; (f) the Attorneys General in the State(s) where the Assets are located; (g) all federal, state and local taxing authorities in the State(s) where the Assets are located; (h) all parties that have asserted liens against the Assets; and (i) all parties included on the Debtors' consolidated creditor matrix and all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.

21.     The Debtors shall also post the Notice of Auction and Sale Hearing and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent, Prime Clerk, LLC.

22.     Within twelve (12) hours following conclusion of the Auction, the Debtors propose to file a notice on the Court's docket identifying the Successful Bidder(s) for the Assets (or subset thereof) and any applicable Next-Highest Bidder(s).

**C.      Assumption and Assignment Procedures**

23.     To facilitate the Sale, the Debtors seek authority to assume and assign to the Successful Bidder(s) certain executory contracts and unexpired leases, as selected by such Successful Bidder(s) in its Successful Bid(s) (the "**Assumed Contracts**") in accordance with the Assignment Procedures set forth below.

24.     The proposed Assignment Procedures are as follows:

a.      On or before January 8, 2020, the Debtors shall file with this Court and serve on each Non-Debtor Counterparty to each of the Contracts the Potential Assumption and Assignment Notice.  In the event that the Debtors identify any Non-Debtor Counterparties which were not served with the Potential Assumption and Assignment Notice, the Debtors may subsequently serve such Non-Debtor Counterparty with a Potential Assumption and Assignment Notice, and the following procedures will nevertheless apply to such Non-Debtor Counterparty; provided, however, that the Cure Cost/Assignment Objection Deadline (defined below) with respect to such Non-Debtor Counterparty shall be 4:00 p.m. (prevailing Eastern Time) on the date that is the earlier of January 22, 2020, or fourteen (14) days following service of the Potential Assumption and Assignment Notice.

b.      The Potential Assumption and Assignment Notice served on each Non-Debtor Counterparty shall (i) identify each Contract; (ii) list the proposed calculation of the cure amounts that the Debtors believe must be paid to cure all defaults outstanding under the Contract as of such date (the "**Cure Costs**"); (iii) include a statement that assumption and assignment of such Contract is not required or guaranteed; and (iv) inform such Non-Debtor Counterparty of the requirement to file any Cure Cost/Assignment Objections (defined below) by the Cure Cost/Assignment Objection Deadline (defined below).  Service of a Potential Assumption and Assignment Notice does not constitute an admission that a particular

Contract is an executory contract or unexpired lease of property, or confirm that the Debtors are required to assume and/or assign such Contract.

c.    Objections (each, a "**Cure Cost/Assignment Objection**"), if any, to (i) the scheduled Cure Costs, and/or (ii) the proposed assumption, assignment and/or transfer of such Contract (including the transfer of any related rights or benefits thereunder), other than objections that relate specifically to the identity of a Successful Bidder, must (x) be in writing; (y) state with specificity the nature of such objection, including the amount of Cure Costs in dispute and (z) be filed with this Court and properly served on the Notice Parties (as defined below) so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on January 22, 2020 (the "**Cure Cost/Assignment Objection Deadline**"), subject to the proviso in subparagraph (a) above.

d.    Objections (a "**Post-Auction Objection**") of any Non-Debtor Counterparty related solely to the identity of and adequate assurance of future performance provided by the Successful Bidder must be raised at or before the Sale Hearing (the "**Post-Auction Objection Deadline**"), subject to the proviso in subparagraph (a) above; provided, however, that in the event that the Debtors obtain a Stalking Horse Bid and provide notice of the identity of the Stalking Horse Bidder in the Potential Assumption and Assignment Notice, any objection of a Non-Debtor Counterparty related to Stalking Horse Bid (including with respect to the identity of and adequate assurance of future performance provided by) the Stalking Horse Bidder must be filed as a Cure Cost/Assignment Objection by the Cure Cost/Assignment Objection Deadline.

e.    Any Non-Debtor Counterparty to a Contract who fails to timely file and properly serve a Cure Cost/Assignment Objection or timely raise a Post-Auction Objection as provided herein will (i) be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts with respect to such Contract in the event it is assumed and/or assigned by the Debtors and the Debtors shall be entitled to rely solely upon the Cure Costs, and (ii) be deemed to have consented to the assumption, assignment and/or transfer of such Contract (including the transfer of any related rights and benefits thereunder) to the relevant Successful Bidder and shall be forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder that any additional amounts are due or defaults exist, or conditions to assumption, assignment, and/or transfer must be satisfied under such Contract, or that any related right or benefit under such Contract cannot or will not be available to the relevant Successful Bidder.  If a Cure Cost/Assignment Objection is timely filed and properly served, the Resolution Procedures (as defined below) will apply.

f.    If a Non-Debtor Counterparty files a Cure Cost/Assignment Objection satisfying the requirements of these Assignment Procedures, the Debtors

and the Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention (the "**Resolution Procedures**"). If the applicable parties determine that the objection cannot be resolved without judicial intervention in a timely manner, this Court shall make all necessary determinations relating to such Cure Cost/Assignment Objection at a hearing scheduled pursuant to the following Paragraph.

g.       Consideration of unresolved Cure Cost/Assignment Objections and Post-Auction Objections relating to all Contracts, if any, will be held at the Sale Hearing, provided, however, that (i) any Contract that is the subject of a Cure Cost/Assignment Objection with respect solely to the amount of the Cure Cost may be assumed and assigned prior to resolution of such objection (ii) the Debtors, in consultation with the Consultation Parties and the parties to any Contract that is subject to a Cure Cost/Assignment objection, may adjourn a Cure Cost/Assignment objection, and (iii) the Debtors shall pay any undisputed Cure Cost on or before the Closing Date, and shall appropriately reserve funding for the disputed portion of the Cure Costs.

h.       A timely filed and properly served Cure Cost/Assignment Objection or a timely raised Post-Auction Objection will reserve the filing Non-Debtor Counterparty's rights relating to the Contract, but will not be deemed to constitute an objection to the relief generally requested in the Motion with respect to the approval of the Sale.

i.       The Debtors' assumption and/or assignment of a Contract is subject to approval by this Court and consummation of the Sale. Absent consummation of the Sale and entry of a Sale Order approving the assumption and/or assignment of the Contracts (with such Contracts being listed as an exhibit to the Sale Order), the Contracts shall be deemed neither assumed nor assigned, and shall in all respects be subject to subsequent assumption or rejection by the Debtors.

j.       The Debtors' decision to assume and assign the Contracts to the relevant Successful Bidder is subject to this Court's approval and the closing of the Sale. Accordingly, absent this Court's approval and the closing of the Sale, the Contracts shall not be deemed assumed or assumed and assigned, and shall in all respects be subject to further administration by the Debtors and their estates under the Bankruptcy Code in connection with these Chapter 11 Cases.

## BASIS FOR RELIEF REQUESTED

### I.  THE BIDDING PROCEDURES ARE APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTORS, THEIR ESTATES, AND CREDITORS

#### A.  The Bidding Procedures are Reasonable, Appropriate and Will Maximize Value

25.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See In re Mushroom Transp. Co.,* 382 F.3d 325, 339 (3d Cir. 2004) (noting debtor in possession "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics, Corp v. Chinery,* 330 F.3d 548, 573 (3d Cir. 2003) (same); *Four B. Corp. v. Food Barn Stores, Inc. (In re Barn Stores, Inc.),* 107 F.3d 558, 564–65 (8th Cir. 1997) (observing in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand").

26.    To that end, courts uniformly recognize that procedures to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy transactions.  *See In re O'Brien Envtl. Energy, Inc.,* 181 F.3d 527, 537 (3d Cir. 1999); *see also Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.),* 147 B.R. 650, 659 (S.D.N.Y. 1992) (stating bid procedures "encourage bidding and . . . maximize the value of the debtor's assets").

27.    The Debtors believe that the Bidding Procedures will provide an orderly and uniform mechanism by which interested buyers and investors can submit offers for the Assets and will ensure a competitive and fair bidding process.  The Debtors also believe that the Bidding Procedures will promote active bidding from seriously interested parties and will confirm the best and highest offer reasonably available for such assets.  The Bidding Procedures will allow the Debtors to conduct one or more Auctions, subject to the terms of the Bidding Procedures, in a controlled, fair and open manner that will encourage participation by financially capable bidders that demonstrate the ability to close a transaction.  The Debtors believe that the Bidding Procedures

will encourage bidding, are consistent with other procedures routinely approved by courts in this and other districts, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. *See In re Brookstone Holdings Corp.,* No. 18-11780 (BLS) (Bankr. D. Del. Sept. 7, 2018); *In re O'Brien Envtl. Energy, Inc.,* 181 F.3d at 537; *see also In re Dura Auto. Sys., Inc.,* No. 06-11202 (KJC) (Bankr. D. Del. July 24, 2007); *In re New Century TRS Holdings, Inc.,* No. 07-10416 (BLS) (Bankr D. Del. Apr. 20, 2007).

### B.    The Qualified Bid Requirements are Reasonable and Appropriate

28.    The Debtors are seeking authority to sell the Assets without, at this time, the comfort of a stalking horse bid to set the floor for bidding.  The Debtors therefore need the flexibility to disregard bids that—in the Debtors' business judgment—would result in an unreasonably low return to creditors and other stakeholders.  Accordingly, in the event that the Debtors determine, after consultation with their advisors and the Consultation Parties, that any particular bids are not for a fair and adequate price or the acceptance of such bids would not be in the best interests of the estates or the Auction, such bids shall not be "Qualified Bids" entitled to participation at the Auction.  As provided in the Bidding Procedures, the Debtors and their estates, in consultation with the Consultation Parties and with the consent of the DIP Agent, which consent shall not be unreasonably withheld, and consistent with the terms of the DIP Credit Agreement, reserve the right to modify the Bidding Procedures at or prior to the Auction, including, without limitation, to extend the deadlines set forth in the Bidding Procedures, modify bidding increments, waive terms and conditions set forth herein with respect to any or all Potential Bidders (including, without limitation, the Bid Requirements), impose additional terms and conditions with respect to any or all potential bidders, adjourn, postpone or cancel the Auction at or prior to the Auction, and adjourn the Sale Hearing.

29.     In the event that the Debtors obtain more than one competing Qualified Bid with respect to the Assets and the Auction is held, bidding shall commence at the amount of the highest or otherwise best bid received for such assets, which determination will be communicated to Qualified Bidders prior to the commencement of the Auction, and the relevant Qualified Bidders may submit successive bids in higher increments (in amounts to be determined at or prior to the Auction).

**C.     The Flexibility to Obtain Stalking Horse Bids is Appropriate and Warranted**

30.     As discussed above, the Bidding Procedures contemplate that the Debtors may solicit potential bidders to serve as Stalking Horse Bidders and deliver Stalking Horse Bids. Accordingly, in the event a Stalking Horse Bid is obtained with respect to the Assets, all bidders will be required to submit a bid in the amount of at least the Stalking Horse Overbid in order to meet the criteria of a Qualified Bid.

31.     Further, the Bidding Procedures contemplate that the Debtors may seek Court approval, at the Bidding Procedures Hearing or on shortened notice thereafter, to provide customary bid protections to any Stalking Horse Bidder, including but not limited to a break-fee and/or expense reimbursement.

32.     The Debtors submit that (i) the flexibility to designate a Stalking Horse Bidder (or Bidders) and (ii) the Debtors' reservation of rights to seek bid protections for any such Stalking Horse Bidders are necessary and appropriate given the significant benefits that a Stalking Horse Bid may provide to the Debtors.  A Stalking Horse Bid would provide a "floor" price that is desirable for the Debtors, thereby increasing the likelihood that the ultimate price obtained for the Assets will represent their true worth.

**D.     The Notice Procedures for the Sale, Bidding Procedures, Auction and Sale Hearing are Reasonable and Appropriate**

33.     Pursuant to Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify creditors of the Sale, including a disclosure of the time and place of any auction, the terms and conditions of the sale, and the deadline for filing any objections.  The Debtors submit that the notice procedures described above fully comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Sale, Bidding Procedures, Auction, and Sale Hearing to the Debtors' creditors and all other parties in interest that are entitled to notice, as well as those parties that have expressed a bona fide interest in acquiring the Assets.

34.     Accordingly, the Debtors respectfully request that the Court approve the notice procedures set forth in this Motion, including the form and manner of service and publication of the Notice of Auction and Sale Hearing, and that no other or further notice of the Sale, Bidding Procedures, Auction or Sale Hearing is necessary or required.

**E.     The Assignment Procedures are Reasonable and Appropriate**

35.     As part of this Motion, the Debtors also seek authority under sections 105(a) and 365 of the Bankruptcy Code to assume the Contracts and assign to the Successful Bidder(s).  The Bidding Procedures Order specifies the process by which the Debtors will serve the Potential Assumption and Assignment Notice and the procedures and deadlines for Non-Debtor Counterparties to file Cure Cost/Assignment Objections and/or raise Post-Auction Objections.

36.     The Assignment Procedures ensure that each Non-Debtor Counterparty will have sufficient notice of such potential assumption and assignment, and an opportunity to contest the Cure Amount, if any, for its Contract, as well as the ability of the relevant Successful Bidder(s) to provide adequate assurance of future performance with respect to such Contract.

37.     Accordingly, the Debtors submit that the Assignment Procedures are fair and reasonable, and request that the Court approve such procedures.

## II.    APPROVAL OF THE SALE IS APPROPRIATE AND IN THE BEST INTERESTS OF THE DEBTORS' ESTATES

### A.    The Sale is Authorized by Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment.

38.     Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]"  11 U.S.C. § 363(b).  Although section 363 does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, courts routinely authorize sales of a debtor's assets if such sale is based upon the sound business judgment of the debtor.  *See Meyers v. Martin (In re Martin),* 91 F.3d 389, 395 (3d Cir. 1996); *In re Montgomery Ward Holding Corp.,* 242 B.R. 147, 153 (D. Del. 1999); *In re Delaware & Hudson Ry. Co.,* 124 B.R. 169, 175–76 (D. Del. 1991); *In re Trans World Airlines, Inc.,* No. 01-00056 (PJW), 2001 WL 1820326, at *10 (Bankr. D. Del. Apr. 2, 2001).

39.     Courts typically consider the following factors in determining whether a proposed sale satisfies this standard:   (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was given to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith.  *See In re Decora Indus., Inc.,* No. 00-4459 (JJF), 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Delaware & Hudson Ry. Co.,* 124 B.R. at 176); *In re United Healthcare Sys. Inc.,* No. 97-1159, 1997 WL 176574, at *4 & n.2 (D.N.J. Mar. 26, 1997).

40.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business may be found where such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  *See, e.g., In re Abbotts Dairies of Pa., Inc.,* 788 F.2d

143 (3d Cir. 1986); *In re Lionel Corp.,* 722 F.2d 1063 (2d Cir. 1983); *see also In re Food Barn Stores, Inc.,* 107 F.3d 558, 564–65 (8th Cir. 1997) (stating that the paramount goal in any proposed sale of property of the estate is to maximize value).

41.     Furthermore, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp),* 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). There is a presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Integrated Res., Inc.,* 147 B.R. at 656 (quoting *Smith v. Van Gorkcom,* 488 A.2d 858, 872 (Del. 1985)). Thus, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code. Indeed, when applying the business judgment standard, courts show great deference to a debtor's business decisions. *See Pitt v. First Wellington Canyon Assocs. (In re First Wellington Canyon Assocs.),* No. 89 C 593, 1989 WL 106838, at *3 (N.D. Ill. Sept. 8, 1989) ("Under this test, the debtor's business judgment . . . must be accorded deference unless shown that the bankrupt's decision was taken in bad faith or in gross abuse of the bankrupt's retained discretion.").

42.     Pursuant to the Bidding Procedures, the Debtors, in consultation with their advisors and the Consultation Parties, will reserve the right to disregard and disqualify any bid that does not contain a fair and adequate price or the acceptance of which would not be in the best interests of the estates or the Auction. In addition, the value of the Assets will be tested through the Auction and Sale process provided for in the Bidding Procedures. Consequently, the fairness and

reasonableness of the consideration for the Assets to be paid by the Successful Bidder(s) ultimately will be demonstrated by adequate "market exposure" and an open and fair auction and sale process—the best means for establishing whether a fair and reasonable price is being paid.  The Successful Bid(s) will constitute the highest or best offer for the Assets, and may provide a greater recovery for the Debtors' estates than is likely to be provided by any other available alternative. As a result, the Debtors' determination to sell the Assets through an auction and sale process, as provided for in the Bidding Procedures, is a valid and sound exercise of the Debtors' business judgment.

43.    Accordingly, the Debtors respectfully request that the Sale be approved.

**B.    The Sale, Free and Clear of All Encumbrances, is Authorized by Section 363(f) of the Bankruptcy Code.**

44.    In the interest of attracting the highest and best bids for the Assets, the Debtors submit that the Sale should be free and clear of all encumbrances in accordance with section 363(f) of the Bankruptcy Code, with any such encumbrances attaching to the net proceeds of the Sale, as and to the extent applicable.

45.    Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

- applicable non-bankruptcy law permits sale of such property free and clear of such interests;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11  U.S.C. § 363(f).

46.     Section 363(f) is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. § 105(a).

47.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets "free and clear" of all encumbrances.  *See In re Kellstrom Indus., Inc.,* 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens."); *see also Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot),* 94 B.R. 343, 345 (E.D. Pa. 1988) (same); *In re Dundee Equity Corp.,* No. 89-10233 (FGC), 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992) (same).

48.     The Debtors submit that one or more of the conditions set forth in section 363(f) of the Bankruptcy Code will be satisfied with respect to the Sale.  In particular, the Debtors believe that at least section 363(f)(2) will be satisfied because each of the parties holding liens on the Assets will consent, or absent any objection to the Sale, will be deemed to have consented to, the Sale.  Any lienholder also will be adequately protected by having its liens, if any, attach to the proceeds of the Sale, in the same order of priority, with the same validity, force and effect that such creditor had prior to such sale, subject to any claims and defenses that the Debtors and their estates may possess with respect thereto.  For the avoidance of doubt, nothing in this Motion, the Bidding Procedures, or the Bidding Procedures Order waives or modifies any parties' right to object to any sale proposed in connection herewith, with all such rights being expressly preserved.

49.     Accordingly, the Debtors respectfully request that the Assets be sold free and clear of any encumbrances pursuant to section 363(f) of the Bankruptcy Code.

C.    **The Successful Bidder(s) Will be Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code, and the Sale Does Not Violate Section 363(n) of the Bankruptcy Code**

50.    Section 363(m) of the Bankruptcy Code protects the sale of a debtor's property to a good faith purchaser.  Specifically, section 363(m) provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

51.    While the Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.* held that the misconduct that would destroy a purchaser's good faith status at a judicial sale typically involves "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." 788 F.2d at 147 (citation omitted); *see also Kabro Assocs. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.),* 111 F.3d 269, 276 (2d Cir. 1997) ("Typically, the misconduct that would destroy a [buyer]'s good faith status at a judicial sale involves fraud, collusion between the [buyer] and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders.").

52.    The Debtors submit, and the testimony presented at the Sale Hearing will demonstrate, that the terms and conditions of the Sale will have been negotiated by the Debtors and the Successful Bidder(s) at arm's-length and in good faith, with the assistance of the Debtors' advisors, and that the parties did not engage in any conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code.

53.     Accordingly, the Debtors request that the Court make a finding at the Sale Hearing that the Successful Bidder(s) purchased the Assets in good faith and that such purchase will be entitled to the full protections of section 363(m) of the Bankruptcy Code.

## III.    ASSUMPTION AND ASSIGNMENT OF THE CONTRACTS IS AUTHORIZED BY SECTION 365 OF THE BANKRUPTCY CODE

### A.    The Debtors' Sound Business Judgment Supports the Assumption and Assignment of the Contracts

54.     Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor in possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> (b)(l) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee-
>
> (A) cures or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

55.     The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate.

*See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.,* 872 F.2d 36, 40 (3d Cir. 1989); *see also NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113).

56.      Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract.  *See In re Decora Indus., Inc.*, No. 00-4459 (JJF), 2002 WL 32332749, at *8; *Official Comm. for Unsecured Creditors v. Aust (In re Network Access Sols., Corp.,* 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); *In re Exide Techs.,* 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard").

57.      To determine if the business judgment standard is met, the court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances*." In re AbitibiBowater Inc.,* 418 B.R. 815, 831 (Bankr. D. Del. 2009).  "This is not a difficult standard to satisfy and requires only a showing that rejection will benefit the estate." *Id.* (citations omitted).  Specifically, a court should find that the assumption or rejection is elected on "an informed basis, in good faith, and with the honest belief that the assumption . . . [is] in the best interests of [the debtor] and the estate." *Network Access Sols.,* 330 B.R. at 75.  Under this standard, a court should approve a debtor's business decision unless that decision is the product of bad faith or a gross abuse of discretion.  *See In re Fed. Mogul Global, Inc.,* 293 B.R. 124, 126 (D. Del. 2003).

58.      In the present case, the Debtors' assumption and assignment of the Contracts to the relevant Successful Bidder will meet the business judgment standard and satisfy the requirements of section 365 of the Bankruptcy Code.  The assumption and assignment will likely be necessary

for the Successful Bidder(s) to conduct business going forward, and since it is anticipated that no Successful Bidder(s) would take the Assets without certain Contracts, the assumption and assignment of such agreements is essential to securing the highest or best offer for the Assets.

59.    Consequently, the Debtors submit that the Assignment Procedures are fair and reasonable, and respectfully request the Court to approve such procedures and authorize the Debtors to assume and assign the Contracts in the manner provided for herein.

**B.    Adequate Assurance of Future Performance Will be Demonstrated with Respect to the Contracts**

60.    A debtor in possession may assign an executory contract or an unexpired lease of the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code, and provides adequate assurance of future performance by the assignee, whether or not there has been a default under the agreement.  *See* 11 U.S.C. § 365(c)(2).

61.    The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng'g Corp. (In re Sanshoe Worldwide Corp.),* 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), *aff'd,* 993 F.2d 300 (2d Cir. 1993); *In re Prime Motor Inns Inc.,* 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994); *In re Rachels Indus. Inc.,* 109 B.R. 797, 803 (Bankr. W.D. Tenn. 1990); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.),* 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

62.    Significantly, among other things, adequate assurance of future performance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.,* 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating that adequate assurance of future performance is present when the prospective assignee of a lease from the debtor has financial resources and has expressed

willingness to devote sufficient funding to the business in order to give it a strong likelihood of succeeding).

63.     Pursuant to the Bidding Procedures, the Potential Bidders are required to provide to the Debtors such financial and other information providing adequate assurance of future performance under any executory contracts and unexpired leases to be assumed pursuant to section 365 of the Bankruptcy Code in connection with the Sale, in a form requested by the Debtors, in consultation with the Consultation Parties, to allow the Debtors to serve, within one (1) business day after such receipt, such information on any Non-Debtor Counterparty that has requested, in writing, such information.    Moreover, under the Assignment Procedures, the Non-Debtor Counterparties will have the opportunity to object to adequate assurance of future performance by the relevant Successful Bidder(s).

64.     Accordingly, the Debtors submit that the assumption and assignment of the Contracts as set forth herein should be approved pursuant to section 365 of the Bankruptcy Code.

## **REQUEST FOR WAIVER OF BANKRUPTCY RULES 6004(h) AND 6006(d)**

65.     Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Similarly, Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the [debtor] to assign an executory contract or unexpired . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6006(d).

66.     The Debtors submit that cause exists to justify a waiver of the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d), as promptly closing the Sale is of critical importance.  The Debtors therefore request that the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) be waived.

25051259.11

## **RESERVATION OF RIGHTS**

67.      Nothing contained herein is intended, or should be construed, as an admission of the validity of any claim against the Debtors or a waiver of the Debtors' rights to dispute any claim. Nothing contained herein is intended, or should be construed, as an approval, assumption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

## **NOTICE**

68.      The Debtors have provided notice of this Motion to:  (a) the Office of the United States Trustee for the District of Delaware; (b) holders of the fifty (50) largest unsecured claims on a consolidated basis against the Debtors, and counsel to the Committee, if one has been appointed; (c) counsel to the DIP Agent and Prepetition Agent; (d) all persons known or reasonably believed to have asserted an interest in the Assets; (e) the Non-Debtor Counterparties to the Contracts; (f) all federal, state and local taxing authorities in the State(s) where the Assets are located; (g) all parties who have asserted liens against the Assets; and (h) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002.

69.      In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.


*[Remainder of Page Intentionally Left Blank]*

25051259.11

## **CONCLUSION**

WHEREFORE, the Debtors request the entry of the Bidding Procedures Order and

Sale Order, respectively, and granting such other and further relief as is just and proper.

Dated: December 23, 2019          YOUNG CONAWAY STARGATT & TAYLOR, LLP
Wilmington, Delaware

*/s/ Kenneth J. Enos*
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Kenneth J. Enos (No. 4544)
Ian J. Bambrick (No. 5455)
Jaclyn C. Marasco (No. 6477)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1256

*Proposed Counsel to the Debtors*

25051259.11