IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HRB Winddown, Inc., *et al*., | ) | Case No. 19-12689 (BLS) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| Alan N. Halperin, as Liquidating Trustee of the | ) | |
| High Ridge Brands Co. Liquidating Trust, | ) | |
| | ) | |
| Plaintiff, | ) | Adversary Proceeding |
| | ) | |
| v. | ) | |
| | ) | Adv. Proc. No.  21-51412 (BLS) |
| Arawak IX, L.P., Clayton, Dubilier & Rice, LLC, | ) | |
| John C. Compton, Vindi Banga (a/k/a Manvinder | ) | Related Adv. Doc. No. 41, 43, 44, 63 |
| Banga), Kenneth A. Giuriceo, Gregory L. Pasqua, | ) | 65, 66, 68, 69 |
| and James A. Daniels, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## OPINION

Before the Court is the Plaintiff's Motion to Disqualify Debevoise and Plimpton LLP

("Debevoise") as counsel to the Defendants in this post-confirmation adversary proceeding.  The

Plaintiff contends that, as Trustee of the Liquidating Trust created under the confirmed plan, he

is now the former client of Debevoise, such that the firm cannot be adverse to him here.  For the

reasons that follow, the Court will deny the Motion to Disqualify on the ground that the Plaintiff

is not a former client of Debevoise.

## BACKGROUND

In June 2016, High Ridge Brands Holdings and its affiliates (collectively referred to

hereinafter as "HRB" or the "Debtor") were purchased by Clayton, Dubilier & Rice, LLC

("CD&R"), a private equity fund.  As a result of the acquisition, CD&R was entitled to name

1

four out of five directors on HRB's board of directors.  Debevoise was engaged as counsel to

HRB in August 2016; before and after that time, Debevoise also served as the longstanding

counsel to CD&R.

     In March 2017, less than a year after being acquired by CD&R, HRB used substantially

all of the proceeds of a $250 million bond issuance to repay various loans arising out of the

acquisition (hereinafter referred to as the "2017 Recapitalization").  The Plaintiff contends in this

suit that the 2017 Recapitalization stripped value away from the company and burdened it with

debt, all of which was facilitated by Debevoise who served as counsel to both HRB and CD&R

in connection with 2017 Recapitalization.[1]

### A.  Retention of Debevoise

     As noted above, Debevoise has served as counsel to CD&R for many years and became

engaged to provide legal services to HRB in August 2016 after it was acquired as a portfolio

company by CD&R.  The engagement letter executed by both Debevoise and HRB disclosed the

fact of concurrent representation and provided that Debevoise might potentially represent CD&R

in opposition to HRB in the future.[2]  Specifically, the 2016 engagement letter provided as

follows:

> 5. Conflicts
>
>      As you know, we have represented and continue to represent CD&R,
> the controlling equityholder of the Company, in connection with a number
> of matters, including matters regarding its investment in the Company.  We
> may from time to time also represent private equity firms holding equity,
> indirectly, in the Company.  We do not believe that our representation of
> the Company will generally give rise to any conflicts between the
> Company and CD&R and/or other equityholders.  However, it is possible
> that during the time we are representing the Company, disputes or other
> conflicts may arise between CD&R and/or other equityholders and the
> Company or its affiliates with respect to various matters.  **Accordingly, the**

---

[1]  *See* Adv. Doc. No. 1.

[2]  *See* Joint Ex. 3.

> **Company (i) agrees that we may represent CD&R, even if CD&R's interest are adverse to the Company (including in connection with any dispute or adversarial proceeding against the Company or its affiliates) and even though we may have represented the Company in a substantially related matter, and (ii) waives any conflicts of interest that might arise in such situations and agrees not to seek to disqualify us in those engagements or assert a conflict, in connection with any such representations.**
>
> I encourage you to consult with the Company's internal or other counsel regarding the foregoing waivers so that you can fully consider the possible implications of our representation on the basis described in this letter. By consenting to the arrangements described in this letter, the Company will be waiving any conflict of interest that might arise in the situation described above and agreeing not to seek to disqualify us or to assert a conflict in those engagements.[3]

The 2016 engagement letter was executed by Richard S. Kirk, Jr., HRB's chief operating officer and chief financial officer. Debevoise represented CD&R and HRB during and after the 2017 Recapitalization.

As HRB approached the need to file for bankruptcy relief in 2019, it entered into a new engagement letter with Debevoise.[4] The December 2019 engagement letter again disclosed the concurrent representation with CD&R and provided for a prospective waiver of conflicts:

> I encourage you to consult with the Company's internal or other counsel regarding the foregoing waivers so that you can fully consider the possible implications of our representation on the basis described in this letter. **By consenting to the arrangements described in this letter, the Company will be waiving any conflict of interest that might arise in the situations described above and agreeing not to seek to disqualify us or to assert a conflict in those engagements.[5]**

The 2019 engagement letter was signed on December 13, 2019 by Amanda D.H. Allen, the chief financial officer of HRB. Less than a week later, HRB filed for bankruptcy relief.

---

[3]    *See* Joint Ex. 3 at ¶ 5 (emphasis added).
[4]    *See* Joint Ex. 6.
[5]    *See* Joint Ex. 6 at ¶ 4 (emphasis added).

### B. The Bankruptcy Case

On December 18, 2019, HRB filed its petition for bankruptcy relief under Chapter 11. Shortly thereafter, this Court entered orders authorizing the Debtor to retain Young Conaway Stargatt & Taylor, LLP ("Young Conaway") as its lead bankruptcy counsel under § 327(a) of the Bankruptcy Code and to retain Debevoise as special corporate counsel under § 327(e).[6]

The Court confirmed the Debtor's plan of reorganization (the "Plan")[7] by order dated October 8, 2020, and the Plan went effective shortly thereafter. The Plan provided for the creation of the Liquidating Trust to prosecute certain retained causes of action.[8] The Plan further provided for the transfer of those causes of action to the Trustee, and Mr. Alan Halperin was duly named Trustee of the Liquidating Trust. Separately, the Plan provided for the appointment of a Plan Administrator to manage all assets not transferred to the Trust, reconcile claims, and otherwise implement and consummate the Plan.[9]

On December 16, 2021, the Trustee filed the Complaint[10] commencing this adversary proceeding. In broad terms, the Trustee seeks to recover damages for losses alleged to stem from the 2017 Recapitalization. He contends that CD&R effectively controlled the HRB board at all times relevant to the 2017 Recapitalization, and further contends that CD&R and the other Defendants herein are liable for loses and damages arising from alleged fraudulent conveyances, for breaches of fiduciary duty and other causes of action laid out in the fourteen separate counts of the Complaint. CD&R promptly retained Debevoise as defense counsel, and Debevoise notified the Trustee of its retention on January 3, 2022.[11] On September 16, 2022, the Trustee

---

[6]    *See* Doc. Nos. 113 and 116.
[7]    *See* Doc. No. 609.
[8]    *See* Doc. No. 536.
[9]    *Id.*
[10]   *See* Doc. Nos. 1 and 60 (Second Amended Complaint).
[11]   *See* Schoolman Decl. ¶ 15.

filed his First Amended Complaint,[12] which Defendants moved to dismiss on September 30,

2022.[13] On that same day, the Trustee filed his Motion to Disqualify Debevoise & Plimpton LLP

as Counsel to the Defendants,[14] before filing a Second Amended Complaint on October 21,

2022. [15] The Second Amended Complaint included new allegations regarding Debevoise's

engagement by HRB stemming from the recapitalization.[16]

## JURISDICTION AND VENUE

This Court has jurisdiction to consider this motion pursuant to 28 U.S.C. §§ 157 and 1334,

as well as under Article XV of the Plan and paragraph 17 of the Confirmation Order.[17]  "[O]ne of

the inherent powers of any federal court is the admission and discipline of attorneys practicing

before it."[18]  Venue is proper here under 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

## DISCUSSION

The Court begins its analysis with the observation that a party seeking to disqualify

opposing counsel bears a heavy burden. Disqualification of a party's chosen counsel is a

"drastic" and "extreme" remedy.[19]  As such, courts approach disqualification motions with

"cautious scrutiny, mindful of a litigant's right to counsel of its choice."[20]  The "power to

disqualify stems from a court's authority to supervise the attorneys appearing before it," and the

---

[12]   Adv. D.I. 25.
[13]   Adv. D.I. 36, 37.
[14]   Adv. D.I. 41.
[15]   *Id.*
[16]   *Id.*
[17]   *See* Doc. No. 619.
[18]   *See In re Congoleum Corp.,* 426 F.3d 675, 686 (3d Cir. 2005); *see also In re Meridian Auto. Sys.-Composite Operations, Inc.,* 340 B.R. 740, 744 (Bankr. D. Del. 2006).
[19]   *See In re Boy Scouts of Am.,* 35 F.4th 149, 161 (3d Cir. 2022) ("*Boy Scouts II*"); *Jackson v. Rehm & Haas Co.,* 366 F. App'x 342, 347 (3d Cir. 2010).
[20]   *In re Boy Scouts of Am.,* 630 B.R. 122, 134 (D. Del. 2021) ("*Boy Scouts I*") (internal quotations omitted); *see also Official Comm. of Unsecured creditors of Mervyn's Holdings LLC,* No. 08-51402 KG, at 14 (Bankr. D. Del. Oct. 1, 2009) ("disqualifications are disfavored for good reasons, most importantly because a party is denied the lawyer of its choice and there is the potential for abuse.").

decision whether to disqualify is discretionary and "never is automatic."[21]  Rather, "[e]ven when

an ethical conflict exists (or is assumed to exist), a court may conclude based on the facts before

it that disqualification is not an appropriate remedy."[22]  To prevail, the moving party must

"clearly demonstrate" that the remedy of disqualification is warranted.[23]

Courts are particularly chary of ordering disqualification where there are concerns that a

litigant might seek disqualification to obtain a tactical advantage.  In the present case, the Trustee

has gone to some lengths to preemptively address just those concerns.  Specifically, the Trustee

reports that he raised "concerns and reservations regarding Debevoise's representation of

CD&R" immediately upon learning of the firm's involvement.[24]  The parties also entered into a

stipulation noting the dispute and reserving all rights pending further proceedings and,

potentially, mediation.

The Court is satisfied the Plaintiff is not pressing his Motion to obtain a tactical

advantage or unfairly disrupt CD&R's defense of this suit.  Significantly, the conflict issues were

raised promptly, and are being addressed while this suit is in its infancy.  While the Motion will

be denied for reasons set forth below, the complex history of proceedings here and the

intertwined relationship between CD&R and HRB are such that the Plaintiff's concerns cannot

be immediately disregarded as a tactical ploy.

Turning to the substance of the Motion, the Plaintiff contends that he is a "former client"

of Debevoise and that this suit is substantially related to matters where Debevoise represented

---

[21]  *Boy Scouts II,* 35 F.4th at 160 (internal quotations omitted).
[22]  *Id.; see also Boy Scouts I,* 630 B.R. at 135 ("[T]here is an overwhelming body of caselaw (including in this district) in which courts deny disqualification motions in the face of what appear to be obvious conflicts.") (internal quotations omitted).
[23]  *Volterra Semiconductor, LLC v. Monolithic Power Sys.,* 2021 WL 3726914, at *2 (D. Del. June 28, 2021).
[24]  *See* Motion at p. 12–14.

HRB.  Model Rule 1.9(a) prohibits an attorney from representing a new client in a matter adverse

to the former client that is "substantially related" to the representation of the former client:

> A lawyer who has formerly represented a client in a matter shall not
> thereafter represent another person in the same or substantially related
> matter in which that person's interests are materially adverse to the
> interests of the former client unless the former client gives informed
> consent, confirmed in writing.[25]

In determining whether a "substantial relationship" exists, the Court's primary

concern is whether there is a "substantial risk that confidential factual information as

would normally have been obtained in the prior representation would materially advance

the client's position in the subsequent matter."[26]  Addressing this concern, Model Rule

1.9(c) prohibits a lawyer who formerly represented a client in a matter from using

information relating to the representation to the disadvantage of the former client. Model

Rule 1.9(c)(2) also prevents attorneys from revealing information relating to the

attorney's former representation of the client.  Similarly, Model Rule 1.9(c)(1) requires

attorneys not to reveal information to the disadvantage of the attorney's former client.

Plaintiff contends that, as Trustee of the Liquidating Trust that emerged from the

Debtor's confirmed Plan, he stands squarely in the shoes of HRB.  In that capacity, he

alleges that he is the former client of Debevoise and can thus prevent the firm from

representing CD&R, his litigation adversary in this suit.

Debevoise first argues that Model Rule 1.9 cannot apply here because, the firm

has never actually represented either Mr. Halperin or the Liquidating Trust, and so they

cannot be "former clients" of Debevoise.  The question cannot be disposed of so easily,

---

[25]    Model Rule 1.9(a).

[26]    *In re Meridian Auto. Sys.-Composite Operations, Inc.,* 340 B.R. 740, 747 (Bankr. D. Del. 2006); *see also Madukwe v. Delaware State Univ.,* 552 F. Supp. 2d 452, 458 (D. Del. 2008).

however:  the Plaintiff here alleges that he has effectively succeeded in all respects to the position of HRB, so that simply reviewing a Debevoise client list for his name is not sufficient to evade the strictures of the Model Rule.

Accordingly, the threshold question is whether the Trustee "stands in the shoes" of HRB and is in fact its successor.  The plain terms of the confirmed Plan indicate otherwise.  Debevoise, along with Young Conaway, represented HRB in the Chapter 11 case.  Under § 9.4 of the Plan, the company continued in existence following confirmation, with Young Conaway continuing as its counsel.  The Plan is very specific in providing for the continuity of management of the Debtor, its assets and affairs *through the Plan Administrator*:

### 9.4 Appointment of Plan Administrator and Wind-Up and Dissolution of the Debtors.

From and after the Effective Date, **the Debtors shall continue in existence pursuant to the terms of the Plan** and shall continue to hold the non-Liquidating Trust Debtor Assets, and the Plan Administrator shall be appointed as of the Effective Date.  The Plan Administrator shall be representative of the Estates within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code appointed to administer the Non-Liquidating Trust Debtor Assets with respect to the rights and powers granted in the Plan and the Confirmation Order.  … From and after the Effective Date, the Plan Administrator shall be the sole member of each Debtor that is not dissolved as of the Effective Date.  The Plan Administrator is authorized and empowered to administer and liquidate the Non-Liquidating Trustee Debtor Assets and effect the dissolution of any of the Debtors under applicable law to the extent feasible as soon as practicable after the Effective Date without the need for any company action or approval, and neither the Debtors nor the Plan Administrator (nor the Liquidating Trustee nor any Beneficiary) shall be required to pay and taxes or fees to cause such dissolution.  On the Effective Date or as soon thereafter as is reasonably practicable, the Plan Administrator shall wind-up the affairs of the Debtors and file final tax returns for the Debtors.  **All Company governance activities of Debtor shall be exercised by the Plan Administrator and the Plan Administrator shall be authorized and empowered to take or cause to be taken all company actions necessary or appropriate to implement and consummate the Plan.**  The Plan Administrator shall bear the cost and

expense of the wind-up of the affairs of the Debtors and the cost and
expense of the preparation and filing the final tax returns for the Debtors
....[27]

By contrast, the Plan directed that "the Debtors[ ] and the Liquidating Trustee"
were to cooperate to achieve the creation of the Liquidating Trust.[28]  In connection
therewith, the Liquidating Trust would receive the transfer of a defined set of assets to the
Trust.  Whatever estate assets were not transferred to the Trustee were retained – by the
post-confirmation Debtor – to be managed by the Plan Administrator with the assistance
of the services provided by Young Conaway.  In particular, the Plan carefully delineates
boundaries between the Debtor and Liquidating Trust:

**9.5 Creation and Governance of the Liquidating Trust.**

> On the Effective Date, the Debtors and the Liquidating Trustee shall
> execute the Liquidating Trust Agreement and shall take all steps necessary
> to establish the Liquidating Trust in accordance with the Plan …
> Additionally, on the Effective Date the Debtors shall irrevocably transfer
> and shall be deemed to have irrevocably transferred to the Liquidating Trust
> all of their rights, title and interest in and to all of the Liquidating Trust
> Debtor Assets, and in accordance with Bankruptcy Code section 1141,
> except as specifically provided in the Plan or the Confirmation Order, the
> Liquidating Trust Debtor Assets shall automatically vest in the Liquidating
> Trust free and clear of all Claims, Liens, encumbrances, or interests … **For
> the avoidance of doubt, after the Effective Date, the Debtors and the
> Estates shall have no interest in the Liquidating Trust Debtor Assets,
> the transfer of the Liquidating Trust Debtor Assets to the Liquidating
> Trust is absolute, and the Liquidating Trust Debtor Assets shall not be
> held or deemed to be held in trust by the Liquidating Trustee on behalf
> of any of the Debtors or the Estates.**[29]

Under this structure, to the extent there is a "former client" of Debevoise that
survived consummation of the Plan, it would be the Plan Administrator, not the
Liquidating Trustee.  The creation of a new entity, being the Liquidating Trust, and the

---

[27]   Joint Ex. 36 at § 9.4 (emphasis added).
[28]   *See* Doc. No. 536.
[29]   *See* Joint Ex. 36 at § 9.5.

transfer of some assets to that entity do not operate here to extend the attorney/client relationship to the entity that acquires those assets.[30]

Existing case law on this specific issue is scant, but several cases cited by the parties, including *In re Cabe*[31] and *In re Jaeger*,[32] involve Chapter 7 trustees which are statutorily and functionally distinguishable from the Liquidating Trustee. A Chapter 7 trustee, once appointed, is vested with statutory authority over all aspects of a debtor's estate, including operational control.[33]  By contrast, the Liquidating Trustee is a creature of contract. He is appointed under the Plan and possesses only property and powers identified under the Plan. As illustrated above, the Plan in this instance squarely limits the Liquidating Trustee's powers to the Liquidating Trust Debtor Assets (as defined in the Plan). All other rights, including operational control, are to be held and exercised by the Plan Administrator exclusively. Even assuming *arguendo* that the Liquidating Trustee's powers were somewhat more expansive in this case, the fact that such inherent limitations even exist makes a comparison to a Chapter 7 trustee unavailing.

Two other cases cited by the parties have addressed issues similar to the one presented today. In *In re Abengoa Bioenergy Biomass of Kansas, LLC*,[34] a Missouri debtor confirmed a plan of liquidation creating a liquidating trust. An affiliated debtor filed for bankruptcy protection in Kansas shortly after the Missouri filing. Both debtors were represented by the same attorney, and both filed similar liquidating plans with their respective courts. The plan in the Missouri case was confirmed, and a liquidating trustee

---

[30]    *See In re Abengoa Bioenergy Biomass of Kansas*, LLC, 2018 WL 1321951, at *7 (Bankr. D. Kan.) ("The [Liquidating Trust] did not become the Missouri debtors. Rather, it succeeded to their assets, rights, and interests.").
[31]    *In re Cabe & Cato, Inc.*, 524 B.R. 870, 878 (Bankr. N.D. Ga. 2014).
[32]    *In re Jaeger*, 213 B.R. 578, 592 (Bankr. C.D. Cal. 1997).
[33]    *See* 11 U.S.C. § 704 (listing duties and powers of Chapter 7 Trustee).
[34]    *In re Abengoa Bioenergy Biomass of Kansas*, LLC, 2018 WL 1321951 at *1–10.

was appointed in that case.[35] The liquidating trustee of Missouri attempted to collect an intercompany debt by filing a competing plan of liquidation in the Kansas bankruptcy. Prior to the confirmation hearing in Kansas addressing the competing plans, the Missouri trustee moved to disqualify counsel from representing the Kansas debtor under Model Rule 1.9. The court denied the Missouri trustee's motion to disqualify and held that the Missouri trustee was not the former client. Specifically, Chief Judge Nugent observed:

> The [Missouri trustee] did not spring into legal existence until the liquidating plan was confirmed in the summer of 2017, the trust agreement was established, and the liquidating trustee was approved. At that point, [the Missouri trustee] became the post-confirmation designated representative of the estate, making it a separate and distinct entity from the Missouri Debtors.[36]

Likewise, the court in *Las Uvas Valley Diaries* addressed the issue under similar circumstances.[37] In *Las Uvas*, the law firm Askew & White ("A&W") represented the debtor as general bankruptcy counsel both pre- and post-confirmation. The confirmed liquidating plan transferred all of the debtor's assets to a liquidating trust to be managed and sold by a liquidating trustee, and allowed claims were to be paid to the extent funds were available. Several months post-confirmation, a taxing authority holding a secured claim moved to amend its proof of claim. The liquidating trustee objected. With the consent of the debtor, A&W entered its appearance for the taxing authority. The liquidating trustee moved to disqualify A&W, arguing that its prior representation of the debtor in the Chapter 11 case created a disqualifying conflict of interest.[38] The court disagreed, finding that while the debtor's assets were assignable to the liquidating trust,

---

[35]    *Id.* at 4.
[36]    *Id.* at 7.
[37]    *In re Las Uvas Valley Dairies*, 648 B.R. 260 (Bankr. D.N.M. 2022).
[38]    *Id.* at 263.

the attorney-client relationship was not.[39] The court highlighted the rationale in *Abengoa*,

noting that a liquidating trustee may succeed the debtor in certain respects but typically

does not *become* it.[40]  This Court agrees with the reasoning in both *Abengoa* and *Las*

*Uvas* and finds that the Liquidating Trustee here is not the former client of Debevoise.[41]

## **CONCLUSION**

For the reasons stated above, this Court will DENY the Liquidating Trustee's

Motion to Disqualify Debevoise & Plimpton LLP as Counsel to Defendants. An

appropriate order follows.

BY THE COURT:

Dated: May 5, 2023

BRENDAN LINEHAN SHANNON
UNITED STATES BANKRUPTCY JUDGE

---

[39]  *Id.* at 265–6.

[40]  *Id.*

[41]  The Court notes that Debevoise extensively briefed and argued the proposition that even if the Liquidating
Trustee is its former client, the prospective waivers contained in the engagement letters are effective and enforceable
here. Having concluded that the Trustee is not the former client of Debevoise, the Court does not today reach the
waiver argument.